No. 106,406

STATE OF KANSAS, *Appellee*, v. JUSTIN GEORGE DERN, *Appellant*.

(362 P.3d 566)

Opinion filed November 25, 2015.

*Heather R. Cessna*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Sherri L. Schuck*, county attorney, argued the cause, and *Derek Schmidt*, attorney general, was on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.: Justin G. Dern appeals from two convictions of aggravated indecent liberties with a child and two convictions of aggravated criminal sodomy involving his 3-year-old twin daugh-

ters. The State's case rested largely on Dern's admissions to others, including law enforcement, that he had committed these offenses. This aspect of the case requires application of our long-standing common-law corpus delicti rule. In so doing, we clarify how the rule applies to crimes that produce no tangible harm or injury.

Dern advances six claims of reversible error: (1) the failure to suppress his confession to law enforcement, which he claims was involuntary; (2) the admission of evidence that he confessed to other, uncharged acts of sexual misconduct with his daughters; (3) the application of the invited error doctrine to affirm his aggravated criminal sodomy convictions on the basis of jury instructions that set out alternative means; (4) the lack of corroborating evidence under the common-law corpus delicti rule to support the two convictions involving one daughter; (5) the giving of the aggravated indecent liberties with a child instruction, which Dern claims presented the jury with alternative means; and (6) the giving of the reasonable doubt instruction, which Dern alleges improperly stated the burden of proof.

We affirm Dern's two convictions for aggravated indecent liberties with a child and the life sentences imposed for them. We reverse both aggravated criminal sodomy convictions because the jury was improperly instructed on alternative means of committing that crime without supporting evidence for each means presented to the jury, and the Court of Appeals panel erroneously applied the invited error doctrine to preserve those convictions.

## FACTUAL AND PROCEDURAL BACKGROUND

The Court of Appeals aptly summarized the case facts, which were incorporated by reference into Dern's petition for review to this court. The panel found:

"Justin and Jami Dern had been married for 12 years when the alleged incidents occurred. They had three children together—a 7-year-old boy and 3-year-old twin girls, C.D. and F.D. In late June 2010, C.D. told Jami that she had seen 'daddy's peepee,' but Justin quickly explained that she had seen him 'going potty.'

"On the evening of July 29, 2010, Jami took their son to a friend's house for a sleepover while Justin stayed home with the girls. The girls were asleep when Jami returned home.

"After Justin left for work the next morning, Jami asked the girls about their

evening with him. F.D. said, 'I saw daddy's peepee.' When Jami asked her about it, F.D. said, 'Daddy took out his peepee like this,' and pulled down the front of her underwear. She said, 'I touched daddy's peepee.' When Jami asked her how she touched it, F.D. said, 'Up and down like this,' while moving her cupped hand up and down. When Jami asked her if there was anything else she wanted to share, F.D. said, 'I licked daddy's peepee.' When Jami asked her where she licked it, F.D. said, 'I licked his peepee and then I licked his butt. I licked down there by his butt.' C.D., who had been sitting next to Jami during the conversation, said, 'Daddy just made me sad, and I don't want to see that again.'

"Justin denied the girls' allegations at first—once when Jami called him at work and again when he got home. But later that evening, he locked himself in the bathroom. Jami found him sitting on the toilet seat, crying, with a loaded handgun by his side. He told her that he could not remember committing the alleged acts but 'something inside him [told] him that he did it.' She thought he was suicidal so she hid the gun and ammunition.

"The next day, Jami contacted Eric Dannefer, their pastor and Justin's best friend, to tell him Justin was suicidal. After a brief communication with Justin, Dannefer became concerned about Justin's mental state and made him promise not to do anything until they spoke in person. Dannefer visited the [Dern] house that evening. Justin explained to Jami and Dannefer that he had become aroused a couple of months earlier when the girls walked in on him in the restroom and wanted to see his penis. One time, he said, '[D]addy's got to put it away. It's an ouchy,' and when F.D. said, 'Oh, well, can I give it a kiss?' he said, 'Yeah, okay, you can give it a kiss.' Another time, he was sitting on the couch and C.D. wanted to reach up his shorts to touch his penis. Justin confessed that on the night in question the girls had touched and licked his penis and he had masturbated in front of them. Concerned for his mental health and safety, Jami and Dannefer convinced Justin to check himself into the VA hospital. Jami drove him there. Justin was admitted on August 1, 2010, due to suicidal ideation.

"Mario Lopez, an acute care psychiatric social worker at the hospital, was assigned to Justin's case. Justin confessed to Lopez that he had had 'sexual contact' with his girls on four separate occasions, the last of which occurred on July 29, 2010, and involved them touching and licking his penis and him masturbating in front of them.

"Brian Woodworth, a detective with the Pottawatomie County Sheriff's Office, investigated the alleged sexual abuse. Woodworth made an audio recording of his interview with Justin, which took place at the hospital on August 4, 2010. Justin confessed that the sexual abuse had been going on for '[a]bout two months.' It began with C.D.'s curiosity about his penis and progressed to him showing the girls his penis and letting them touch it. 'The third time,' he allowed C.D. to hold and stroke his penis, which aroused him. '[T]he fourth time,' he started to get aroused again so he let the girls touch and kiss his penis and put it in their mouths, and he ejaculated in the living room." *State v. Dern*, No. 106,406, 2013 WL 2395253, at *1-2 (Kan. App. 2013) (unpublished opinion).

After Dern left the VA hospital, the State charged him with two counts of aggravated criminal sodomy and two counts of aggravated indecent liberties—one charge of each crime for each girl based on his conduct on July 29, 2010.

Before trial, the State filed a K.S.A. 60-455 motion to introduce as evidence Dern's admissions of prior sexual misconduct with C.D. and F.D., *i.e.*, the three incidents prior to July 29, 2010, that he had described to his wife and others. The district court granted the State's motion. Dern moved to suppress his statement to law enforcement, arguing it was involuntary. The district court denied that motion.

Jami Dern, Dannefer, Lopez, and Woodworth all testified at trial to the details summarized above. C.D. and F.D. did not testify because the parties stipulated the girls were disqualified under K.S.A. 60-417. When the State rested its case, Dern moved for acquittal of both charges involving C.D. because of insufficient evidence under the common-law corpus delicti rule. The district court denied that motion.

Dern testified in his defense, recanting his admissions. He insisted on his innocence and said the only thing that happened the night the girls came into the bathroom while he was urinating was that he told them to get out and they did. He testified the only true thing was that the girls had seen his penis in a family restroom while out shopping. Dern explained he falsely confessed because he had been "hammered on" for 2 days. He pointed out he had denied all allegations until the Saturday night he met with his wife and Dannefer and confessed to them only after 2 hours of questioning so they would leave him alone. Dern said he was distressed and thought his wife would stay with him if he confessed.

Dern explained further that he confessed to the intake doctor at the VA hospital because his wife was there, and confessed to Lopez because he was still distraught, had an unstable state of mind, and was afraid he would lose his family. He said he had not thought through the consequences of telling a social worker. Finally, Dern said he made up a story for law enforcement because he was told he could get treatment and thought they just wanted to help him. He claimed he was willing to lie to save his family.

The jury convicted on all four counts. Dern received four life sentences with a mandatory minimum of 25 years, two running consecutively and two others concurrently. The Court of Appeals affirmed all four convictions. *Dern*, 2013 WL 2395253, at *13.

Relevant to our review, the panel found Dern's confession voluntary and upheld the denial of his suppression motion. 2013 WL 2395253, at *5. It also held the evidence of his prior sexual misconduct was admissible under K.S.A. 2014 Supp. 60-455 to prove his "criminal disposition." 2013 WL 2395253, at *8. It agreed the jury instruction improperly included alternative means of committing sodomy but declined to reverse those convictions under the invited error doctrine. 2013 WL 2395253, at *10. It held the instruction for committing aggravated indecent liberties with a child did not state alternative means. The panel further held there was adequate corroborating evidence of Dern's crimes against C.D. to satisfy the common-law corpus delicti doctrine. 2013 WL 2395253, at *11. And it held the jury was properly instructed on reasonable doubt. 2013 WL 2395253, at *12. Notably, Dern prevailed on a sentencing issue, and the State did not cross-petition for this court's review. 2013 WL 2395253, at *13. The State also did not cross-petition on the panel's holding that the jury instruction improperly included alternative means of committing sodomy.

Dern petitioned for review of the same issues, which we granted under K.S.A. 20-3018(b). Jurisdiction is proper under K.S.A. 60-2101(b) (review of Court of Appeals decisions upon timely petition for review).

We note Dern's last two challenges on appeal (alternative means on aggravated indecent liberties and the wording of the reasonable doubt instruction) have been resolved adversely to Dern in other cases. This court held the phrase "either the child or the offender, or both" in K.S.A. 21-3504(a)(3)(A)'s definition of aggravated indecent liberties with a child does not create alternative means of committing the crime. *State v. Brown*, 295 Kan. 181, 200-01, 284 P.3d 977 (2012). And in *State v. Herbel*, 296 Kan. 1101, 1124, 299 P.3d 292 (2013), this court held it was not error to issue the challenged reasonable doubt instruction. See 296 Kan. at 1120 (older version of PIK Crim. 3d 52.02 not preferred but legally appropriate). The remaining four challenges are addressed below.

## DERN'S CONFESSION WAS VOLUNTARY

Dern argues his confession at the VA hospital to investigating detectives was involuntary and should have been suppressed. We disagree and hold that his confession was voluntary and admissible.

*Additional Facts*

While Dern was at the VA hospital, two detectives interviewed him. They recorded the entire 40-minute interview. When asked whether he was "locked in here," Dern stated, "Yes. Well, not, no, they're, they're locked out." Dern said he was only taking his regular medications for thyroid, diabetes, and a stomach issue.

Before he confessed, Dern inquired about the possibility for criminal charges and indicated he was unsure if he needed an attorney. He was repeatedly told that he was not under arrest; that the detectives wanted to get some information from him; and that the county attorney would make a decision about charging any criminal conduct. At one point, a detective told Dern the investigators already had a pretty good idea what had happened and the focus was on taking care of Dern and the children. The detective said:

"[Y]ou're a God-fearing man and you love your wife and kids . . . that's totally up to you . . . if you want to get an attorney. We're here just to be able to seek some cooperation with you . . . and didn't come to arrest you."

Right before Dern confessed, the detective asked again if Dern was going to get an attorney, and Dern indicated he was "still trying to [inaudible] my options right now." He was again informed he could get an attorney. Dern then stated, "I want to go through this whole thing in the cooperative stage, I really do . . . I mean attorneys can come later . . . ." He told the detective "this" had been going on for about 2 months and had happened four times. Dern said initially C.D. had wanted to look at and asked to touch his penis, so one day he let her. Dern did not specifically identify a second incident, but he said after the first incident C.D. would always ask to see his privates "and everything like that." And, without detailing what occurred, Dern describes at least one additional incident involving C.D. and F.D. in which he pulled his pants down. The third time, he said, C.D. held, stroked, and kissed his penis. He might

have ejaculated. The fourth time, which resulted in the charges, he said he started to get aroused "so [he] did it again, you know, we went through the whole thing." The girls touched, stroked, kissed, and put his penis in their mouths. Dern ejaculated in the living room.

After saying this, Dern was asked whether he was getting help with his suicidal thoughts. He said he was "past [the suicidal] stage." The detective asked him directly if he was past suicidal, and Dern indicated he was "long past it." Later, Dern asked about the "worst case scenario" for sentencing, and a detective said he did not know.

In his motion to suppress these statements to the detectives, Dern argued his confession was involuntary. He focused on the officers' fairness, alleging they made numerous statements suggesting they "did not want to lock him up and they did not want to arrest him." He argued he was coerced by his wife, who threatened to leave him if he did not confess. Finally, he argued he was "not capable of understanding" what he said because he was still in the VA hospital and there was no indication that concerns about his suicidal impulses had abated.

The district court reviewed both the audio recording and interview transcript. It denied suppression after finding Dern was clearly conscious and capable of understanding what was said and done. It found the evidence did not support the claim that he was incapable of understanding because he was suicidal, citing Dern's statement that he was "long past" the suicidal stage. The court further found no evidence demonstrating compulsion or infliction of suffering during the interview, noting that it took less than 1 hour and that the detectives offered to terminate the interview several times if Dern wanted an attorney. It concluded by holding that Dern's statements were not induced by threats or promises concerning actions to be taken by the county attorney or law enforcement.

At trial, Dern renewed his objection immediately before the detective testified, based on his previous motion to suppress. No new facts or arguments were advanced to support the objection, and the court overruled it based on its previous findings and conclusions from the suppression hearing.

## Standard of Review

"In reviewing a trial court's decision regarding the suppression of a confession, an appellate court reviews the factual underpinnings of the decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard. The appellate court does not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence." *State v. Harris*, 293 Kan. 798, 807, 269 P.3d 820 (2012).

## Analysis

The State bears the burden of proving by a preponderance of the evidence that the confession was voluntary, *i.e.*, the statement was the product of Dern's free and independent will. A nonexclusive list of factors are considered based upon the totality of the circumstances, namely: (1) the defendant's mental condition; (2) the manner and duration of the interrogation; (3) the defendant's ability to communicate with the outside world; (4) the defendant's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the defendant's proficiency with the English language. 293 Kan. at 807-08.

"These factors are not to be weighed against one another with those favorable to a free and voluntary confession offsetting those tending to the contrary. Instead, the situation surrounding the giving of a confession may dissipate the import of an individual factor that might otherwise have a coercive effect. Even after analyzing such dilution, if any, a single factor or a combination of factors considered together may inevitably lead to a conclusion that under the totality of circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act." *State v. Randolph*, 297 Kan. 320, Syl. ¶ 3, 301 P.3d 300 (2013).

Dern begins by citing facts and raising issues not presented to the district court. He cites trial testimony given by Lopez, the social worker, prior to the renewed suppression motion that (1) the ward was locked and Dern was not free to leave; and (2) Dern's doctors remained concerned enough about him that they did not want Dern released. Dern also refers us to the detective's testimony—given after the district court overruled the renewed motion—that law enforcement had not contacted Dern's medical team to determine "the level of his mental instability after his near suicide." Dern then argues, as defense counsel did to the district court, that the statements were involuntary because detectives repeatedly

stated they were turning everything over to the county attorney and did not know what would happen. Finally, Dern cites his mental condition, which he describes as being "seriously in question."

Dern's arguments implicate two of our nonexclusive factors: mental condition and the fairness of the interrogation techniques. But any support for these claims is undercut by the district court's factual findings, which are supported by substantial competent evidence, *i.e.*, evidence that possesses both relevance and substance and which furnishes a substantial basis in fact from which the issues can reasonably be resolved. See *State v. Sharp*, 289 Kan. 72, 88, 210 P.3d 590 (2009).

It is undisputed Dern told law enforcement he was no longer suicidal and wanted to leave the VA hospital that day. Moreover, the detectives repeatedly told Dern he could get an attorney and was not required to talk to them. In addition, Dern was aware criminal charges were a possibility because he asked about it before he confessed and even volunteered that "attorneys can come later, I guess." Finally, his interview lasted less than an hour, was recorded, and the district court found no undue duress or improper conduct by the officers.

Under the totality of the circumstances, the district court correctly held Dern's confession was voluntary and admissible.

## EVIDENCE OF PRIOR SEXUAL MISCONDUCT WAS ADMISSIBLE

Before trial, the State filed a motion to introduce those portions of Dern's admissions evidencing sexual misconduct with his daughters that did not result in criminal charges. See K.S.A. 2014 Supp. 60-455(d) (subject to court's discretion under K.S.A. 60-445, evidence of commission of other sexual misconduct by defendant admissible on any matter to which it is relevant and probative). Over Dern's objection, the State argued this evidence was relevant to Dern's intent and the credibility of the girls' statements to their mother regarding the charged conduct. The district court and the panel agreed. On review, Dern continues to argue this evidence was inadmissible.

After Dern's trial, this court held that, under the applicable version of K.S.A. 60-455, evidence of other acts or offenses of sexual

misconduct by the defendant is admissible to show propensity or any other matter to which it is relevant and probative. See K.S.A. 2014 Supp. 60-455; *State v. Prine*, 297 Kan. 460, 303 P.3d 662 (2013) (*Prine II*). Recognizing this, Dern pivots on his admissibility challenge to argue *Prine II* was wrongly decided—a proposition we have already rejected. See *State v. Spear*, 297 Kan. 780, 789, 304 P.3d 1246 (2013). We continue our adherence to *Prine II* on this issue.

Dern argues next that evidence of his admissions to other misconduct was more prejudicial than probative in his case because the trial defense was not a complete denial of the charges. He contends his statements about prior misconduct that was not charged made it less likely jurors would believe his explanations that he falsely confessed because of mental instability and that he was simply telling his wife and Dannefer what he thought they wanted to hear.

The State argues this evidence's probative value outweighs any prejudice. In doing so, the State accepts Dern's premise that K.S.A. 2014 Supp. 60-455 requires a balancing of probative value against the threat of undue prejudice. See *State v. Dean*, 298 Kan. 1023, 1033, 324 P.3d 1023 (2014) (noting this court had not yet been asked to decide whether the amended statute requires conducting the same balancing test as under the previous statute). We will continue to assume the balancing test applies for the purposes of this case because the parties' arguments follow that assumption.

In denying Dern's motion, the district judge did not explain his reasoning. He simply concluded, "I do not think that it is more prejudicial than probative so I am going to allow that evidence to be entered." Dern did not object to the district court's ruling as inadequate. When no objection is made to the adequacy of the district court's findings, we can presume the district court found all facts necessary to support its judgment. Supreme Court Rule 165(b) (2014 Kan. Ct. R. Annot. 272); *Dragon v. Vanguard Industries*, 282 Kan. 349, 356, 144 P.3d 1279 (2006).

This court reviews the district court's determination that the probative value of evidence outweighs its potential for producing undue prejudice for an abuse of discretion. *State v. Bowen*, 299 Kan. 339, Syl. ¶ 7, 323 P.3d 853 (2014).

Dern confessed to an escalating series of sexual misconduct with his daughters. He was confronted with allegations of one incident, and he erupted into a detailed confession of several others. At trial, Dern recanted and testified he falsely confessed because he was pressured into it. His admissions of prior misconduct were highly probative of the claim that he falsely confessed. They raise the question of why Dern would have made up the additional, prior incidents of escalating sexual misconduct to falsely confess to the single alleged incident with which he was confronted.

In contrast, there is little risk of undue prejudice, which turns not on whether the evidence is damaging but on whether the evidence is likely to contribute to an improper jury verdict or distract from the central issues at trial. See *United States v. Enjady*, 134 F.3d 1427, 1430 (10th Cir. 1998) ("'The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.'") (quoting *Michelson v. United States*, 335 U.S. 469, 476, 69 S. Ct. 213, 93 L. Ed. 168 [1948]). Dern's admissions of prior misconduct were unlikely to contribute to an improper jury verdict. They involved the same victims, and the conduct at issue was of the same character as that underlying the charged crimes. And the jury was tasked with determining whether Dern's trial testimony was more credible than his pretrial admissions.

In this context, the evidence of prior sexual misconduct was not likely to distract from the central issues before the jury. The district court did not abuse its discretion by ruling the evidence's probative value was not outweighed by undue prejudice.

## INVITED ERROR DOCTRINE CANNOT SAVE THE AGGRAVATED CRIMINAL SODOMY CONVICTIONS

*Additional Facts*

Before trial, Dern submitted a two-page list of proposed PIK instructions, including PIK Crim. 3d 57.08 on aggravated criminal sodomy. He then attached that listing to sample instructions with suggested modifications or insertions for some of the instructions. The appellate record does not contain any proposed instructions

from the State. See K.S.A. 22-3414(3) ("[A]ny party may file written requests that the court instruct the jury on the law as set forth in the requests."). Dern's proposed instruction on aggravated criminal sodomy stated:

"The defendant is charged with two (2) counts of the crime of aggravated criminal sodomy. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. That the defendant engaged in sodomy with a child who was under 14 years of age; and

"2. That the act occurred on or about the 29th day of July, 2010, in Pottawatomie County, Kansas."

This language reflects PIK Crim. 3d 57.08, except it omits the final paragraph, which contains the definition of sodomy from PIK Crim. 3d 57.18. Dern did not include a definition of sodomy in his proposed instructions.

The district court issued two instructions on the aggravated criminal sodomy charges—one for each victim. These instructions were identical, except the girls' names were changed. Both aggravated criminal sodomy jury instructions had the following paragraph defining sodomy:

"Sodomy means: (1) oral contact or oral penetration of the female genitalia or oral contact of the male genitalia; (2) oral or anal sexual relations between a person and an animal; (3) sexual intercourse with an animal; or (4) anal penetration, however slight, of a male or female by any body part or object. Sodomy does not include penetration of the anal opening by a finger or object in the course of the performance of generally recognized health care practices or a body cavity search conducted in accordance with the law." (Emphasis added.)

We have previously held K.S.A. 21-3506(a)(1)'s definition of sodomy, which is reflected by the PIK instruction, creates three general but distinct ways to commit it. See *State v. Stafford*, 296 Kan. 25, Syl. ¶ 16, 290 P.3d 562 (2012) (same language and punctuation from statute defining sodomy creates three general but distinct ways to commit crime). In other words, the instruction given in Dern's case set out alternative means, even though there was evidence introduced at trial of only one means—oral contact of genitalia.

As the panel held, and the State does not dispute, the evidence

in Dern's case was insufficient to support Dern's conviction of the other alternative means set out in the jury instruction. This circumstance generally requires reversal of the convictions. *State v. Brooks*, 298 Kan. 672, 677, 317 P.3d 54 (2014) (under the "alternative means rule," reversal is generally required if a jury is instructed on alternative means of committing a single crime and the State fails to present sufficient evidence to support each means).

The State argues reversal is not required because Dern invited the error. The panel agreed and declined to reverse the two sodomy convictions under the invited error doctrine, citing *State v. Schreiner*, 46 Kan. App. 2d 778, 264 P.3d 1033 (2011). Dern, 2013 WL 2395253, at *10. In *Schreiner*, the defendant similarly argued there was insufficient evidence to support his sodomy conviction because the jury was instructed on alternative means of committing sodomy without evidence of all the means. The panel agreed the instruction was erroneous; but it declined to reverse under the invited error doctrine, noting neither party "had any reason to believe there would be such evidence at trial" and the "charging instrument contained no such allegation." 46 Kan. App. 2d at 787-88. The *Schreiner* panel held: "Jury instructions present a prime instance illustrating the soundness of the invited error rule." 46 Kan. App. 2d at 787-88. It further reasoned that application of the invited error rule was appropriate because jury unanimity in criminal cases is a statutory, not constitutional right; and applying the doctrine prevented "unprofessional and destructive gameplaying" by defense counsel. 46 Kan. App. 2d at 791.

But there is a critical distinction between this case and *Schreiner*: Dern did not submit a proposed instruction including the sodomy definition with the alternative means language. In other words, the State's invited error argument is premised on a factual inaccuracy—that defense counsel proposed the overbroad language to the court. In *Schreiner*, the defendant had provided a proposed jury instruction on the sodomy charge that matched the instruction the district court gave in all material respects, including in its definition of sodomy.

The *Dern* panel seemingly recognized this distinction because

it held "by requesting *or not objecting* to the faulty instruction, the error, if there was one, was invited." (Emphasis added.) *Dern*, 2013 WL 2395253, at *10. In doing so, the panel's rationale represents an extension of *Schreiner*, and that extension violates this court's caselaw requiring more than simple failure to object before the invited error doctrine applies. See *State v. Lewis*, 299 Kan. 828, 855, 326 P.3d 387 (2014) (rejecting invited error argument based on defendant's mere acquiescence to jury question response); see also *State v. Angelo*, 287 Kan. 262, 279-80, 197 P.3d 337 (2008) (applying invited error doctrine because defendant affirmatively requested no lesser included offense instruction because his strategy was an "all-or-nothing defense"); *State v. Kirtdoll*, 281 Kan. 1138, 1150, 136 P.3d 417 (2006) (applying invited error doctrine and distinguishing failure to object from affirmatively requesting the challenged instruction).

By simply acknowledging that the invited error doctrine cannot apply in this case, we leave open whether *Schreiner* and its progeny appropriately applied the doctrine when the instruction was in fact requested. See, *e.g.*, *State v. Sasser*, No. 108,149, 2013 WL 5422322 (Kan. App. 2013) (unpublished opinion); *State v. Windsor*, No. 107,152, 2013 WL 1444399 (Kan. App. 2013) (unpublished opinion); *State v. Sims*, No. 106,509, 2012 WL 4372988 (Kan. App. 2012) (unpublished opinion); *State v. Degyves-Chavez*, No. 105,314, 2012 WL 924809 (Kan. App. 2012) (unpublished opinion); *State v. Praylow*, No. 105,711, 2012 WL 1072762 (Kan. App. 2012) (unpublished opinion).

Additionally, we note that because the State failed to argue the point, we are precluded from considering anew the question of whether an alternative means error can ever be harmless.

Hence, we reverse both aggravated criminal sodomy convictions because the jury was improperly instructed on alternative means of committing aggravated criminal sodomy without supporting evidence for each means, and we hold that the Court of Appeals panel erroneously applied the invited error doctrine to save those convictions.

## Dern's Confessions Concerning C.D. Were Sufficiently Trustworthy to Establish the Corpus Delicti

Dern argues there was insufficient independent evidence of aggravated indecent liberties and aggravated criminal sodomy involving C.D. under the common-law corpus delicti rule as it has been applied in this state. Because we have already reversed Dern's conviction for aggravated criminal sodomy against C.D., we will only consider the rule's application to the conviction for aggravated indecent liberties against C.D.

Dern argues that under the corpus delicti rule an extrajudicial confession must be corroborated by independent evidence tending to show the crime was committed. He notes the only evidence arguably corroborating the aggravated indecent liberties crime against C.D. is her statement, "Daddy just made me sad and I don't want to see that again.". And he contends this statement is too vague to sufficiently and independently establish that the crime actually occurred. The State attempts to bolster the evidentiary weight to C.D.'s statement by noting it "came directly on the heels of FD's descriptive disclosure of sexual abuse." We note that both sides agree there was sufficient corroborating evidence regarding the aggravated indecent liberties count involving F.D.; that both crimes were alleged to be temporally related and part of the same course of conduct; and that the same confessions addressed the crimes against both victims.

### The Corpus Delicti Rule

#### 1. Background and Development

Corpus delicti is Latin for "body of the crime." *State v. Doyle*, 201 Kan. 469, 477, 441 P.2d 846 (1968); Black's Law Dictionary 419 (10th ed. 2009). It refers to the existence of an injury (*i.e.*, a death) and a showing that this injury resulted from criminal activity (*i.e.*, a death by homicide). See *State v. Grissom*, 251 Kan. 851, 879, 840 P.2d 1142 (1992) (" 'In homicide cases the corpus delicti is established by proof of two facts: that one person was killed, and that another person killed him.' ").

Most commentators trace the evidentiary rules concerning the State's burden to prove the corpus delicti to 17th century England. Some commentators cite a quote by Lord Hale related to two cases in which the defendant was convicted of murder and executed, but the victim later showed up alive later. Lord Hale is quoted as stating:

> "'I would never convict any person for stealing the goods conjusdam ignoti merely because he would not give an account of how he came by them, unless there were due proof made, that a felony was committed of these goods . . . . I would never convict any person of murder or manslaughter, unless the fact were proved to be done, or at least the body found dead . . . .'" Mullen, *Rule Without Reason: Requiring Independent Proof of the Corpus Delicti as a Condition of Admitting an Extrajudicial Confession*, 27 U.S.F. L. Rev. 385, 399 (1993).

Another explanation for the corpus delicti rule focuses on a different set of English cases involving false confessions. As the Virginia Supreme Court has explained:

> "In 1660, John Perry was subjected to continuous and repeated questioning as to the disappearance of his master, William Harrison. After initially denying all wrongdoing, Perry finally confessed that he, his mother, and his brother had together robbed and murdered Harrison. Although a body was never found, and Perry's mother and brother denied all wrongdoing, all three suspects were convicted and executed on the strength of Perry's confession. Several years later, however, Harrison returned home, claiming to have been kidnapped and sold into slavery in Turkey. In short, Perry had admitted to a falsehood resulting in the execution of himself, his mother, and his brother. See *Perry's Case* (1660), 14 Howell St. Tr. 1312, 1312-24 (Eng.).

> "The injustice of *Perry's Case* and similar cases triggered the creation of the corpus delicti rule, although the corpus delicti rule is not uniformly applied as part of the English common law. *Opper v. United States*, 348 U.S. 84, 90 & n. 5, 75 S. Ct. 158, 99 L. Ed. 101 (1954) ('[English] courts have been hesitant to lay down a rule that an uncorroborated extrajudicial confession may not send an accused to prison or to death.'); 7 John H. Wigmore, Evidence in Trials at Common Law § 2070, at 508-10 (James H. Chadbourn ed., 1978).

> "In the United States, the corpus delicti rule took root after the Boorn trial in Vermont, which replicated the false confession scenario of *Perry's Case*, was widely publicized. See *Trial of Stephen and Jesse Boorn*, 6 Am. St. Tr. 73, 73-95 (1819). The Boorn trial influenced Professor Simon Greenleaf to endorse the corpus delicti rule in his evidence treatise. See 1 Simon Greenleaf, A Treatise on the Law of Evidence § 214, at 275 n. 2 (14th ed. 1883) (discussing the Boorn trial in conjunction with cautious acceptance of verbal confessions); *id.* § 217, at 278-79 (approving the corpus delicti rule). In turn, Professor Greenleaf's treatise has

been noted as having contributed to the corpus delicti rule's near-universal adoption by the states. Wigmore, *supra*, § 2071, at 511." *Allen v. Com.*, 287 Va. 68, 73, 752 S.E.2d 856 (2014).

Considering these origins, the corpus delicti rule's purpose is commonly summarized as: (1) a protection against convicting defendants of imaginary crimes; (2) a means to avoid reliance on false confessions; and (3) a means to promote better police investigations by ensuring that they extend beyond the words of the accused. *People v. LaRosa*, 2013 CO 2, ¶ 17 (2013).

By far the most common application of the corpus delicti requirement has focused on the second purpose—preventing convictions upon false confessions. As such, the application of the corpus delicti rule has principally developed into a rule that

"a bald extrajudicial confession, absent an independent showing of the corpus delicti of the alleged crime, [is] insufficient to sustain a conviction. The rule was born out of a judicial recognition that false confessions do occur as a result of varying factors including: duress; a desire to conceal the guilt of another; or a genuine—though false—belief held by the confessor of his own guilt. Thus, the fundamental purpose of the rule that prohibits convictions based on bald extrajudicial admissions or confessions without any supporting proof of the corpus delicti is to protect against false confessions. It is not intended to protect against confessions which may or may not be true but which were obtained in derogation of the rights of the accused. Numerous constitutional provisions provide such protections and the corpus delicti rule has never been understood to implicate constitutional concerns." *State v. McGill*, 50 Kan. App. 2d 208, 226, 328 P.3d 554 (2014) (Stegall, J., concurring).

While in rare instances, the corpus delicti rule may still be brought to bear on cases that do not involve confessions, such is not the case here, and we do not address the application of the rule in those circumstances.

In Kansas we have long recited—generally without analysis—this strict, "formal" version of the corpus delicti rule. For example, "[t]he State's prima facie showing of corpus delicti must be made independently of admissions or confessions of a defendant." *State v. Dang*, 267 Kan. 198, 208, 978 P.2d 277 (1999) (citing *State v. Pyle*, 216 Kan. 423, 432, 532 P.2d 1309 [1975]); see also, *e.g.*, *State v. Waddell*, 255 Kan. 424, 432-33, 874 P.2d 651 (1994) ("A conviction will be upheld if tangible corpus delicti evidence is proved

outside that of the confession."); *State v. Bradford*, 254 Kan. 133, 139, 864 P.2d 680 (1993) (adopting analysis that "evidence independent of appellant's confession was required to show that his victim had been kidnapped"); *Grissom*, 251 Kan. at 880 (corpus delicti "'"must be established independently of admissions or confessions of the defendant"'"); *State v. Brown*, 236 Kan. 800, 804, 696 P.2d 954 (1985) (corpus delicti for child abuse established by "sordid circumstantial evidence showing excessive neglect and abuse of the victim"); *State v. Higdon*, 224 Kan. 720, 723, 585 P.2d 1048 (1978) (holding "evidence, independent of the appellant's confession, established the *corpus delicti* of the crime of rape"); *Pyle*, 216 Kan. at 432 (" 'The elements [of the corpus delicti of murder] must be established independently of admissions or confessions of the defendant . . . .' ").

For clarity, we will refer to this formulation as the "formal corpus delicti rule." Were we to apply the formal corpus delicti rule to Dern's conviction for aggravated indecent liberties with C.D., we would be compelled to find that the existence of alleged crime— *i.e.*, injury plus criminal agency—was not demonstrated by any independent evidence. The only evidence the State can point to— C.D.'s comment that "Daddy just made me sad, and I don't want to see that again"—is insufficient to *independently* establish the harm via criminal agency that may be inflicted by aggravated indecent liberties with a child. As such, were we to adhere to the formal corpus delicti rule, Dern's confession would be insufficient to sustain his conviction and a reversal would be in order. More important, however, the application of the corpus delicti rule in Kansas does not begin and end with its formal iteration—and neither does our analysis of Dern's claim on appeal.

## 2. Criticisms of the Formal Corpus Delicti Rule

In 1918, Judge Learned Hand questioned whether the corpus delicti rule "has in fact any substantial necessity in justice" and answered on behalf of the court in *Daeche v. United States*, 250 F. 566, 571 (2d Cir. 1918), that "the court was much disposed to doubt." Nearly 100 years later the debate over the efficacy of the formal corpus delicti rule continues. Most modern commentators

writing on the subject have criticized the rule, and many courts have abandoned or greatly modified its requirements. The circumstances of Dern's case illustrate the weaknesses of the formal rule.

In general, courts and commentators criticize the corpus delicti rule because (1) it is difficult to apply and ill-suited to many crimes, and (2) it either fails to accomplish its goal or its goals can be better achieved without the costs inherent in the formal corpus delicti rule.

After discussing the difficulties courts have encountered with the rule, the authors of McCormick on Evidence have observed that application of the rule takes its toll because its "complexity . . . tends only to detract from the requirements real function.» 1 McCormick on Evidence § 148, p. 817 (7th ed. 2013) (hereinafter McCormick); see *State v. Bishop*, 431 S.W.3d 22, 51 (Tenn.), *cert. denied* 135 S. Ct. 120 (2014) (compiling various criticisms on this point). Consequently, many courts have taken pains to avoid strictly applying the rule. See *LaRosa*, 2013 CO 2, ¶ 29; *State v. Mauchley*, 2003 UT 10, ¶¶ 28-33, 67 P.3d 477 (2003).

Other courts have experienced difficulty in applying the formal rule to offenses that fail to produce a tangible injury. 1 McCormick § 147, p. 815. More pertinent to this case, applying the formal corpus delicti rule to crimes involving inappropriate sexual contact "seems especially troublesome" because the contact "often produces no tangible injury." *Mauchley*, 67 P.3d at 484-85. The difficulty is compounded when, as in this case, the young victims are unable to qualify as witnesses who could present evidence of the corpus delicti independent of the confession. See *McGill*, 50 Kan. App. 2d at 236-37 (discussing various jurisdictions' efforts to apply the rule to cases with no tangible injury) (Stegall, J., concurring).

In discussing the harm caused by the formal rule, the Colorado Supreme Court, for example, held:

"We are troubled that the rule works to bar convictions in cases involving the most vulnerable victims, such as infants, young children, and the mentally infirm. We are also aware that the rule operates disproportionately in cases where no tangible injury results, such as in cases involving inappropriate sexual contact, or where criminal agency is difficult or impossible to prove, such as in cases involving infanticide or child abuse. Indeed, in Colorado, LaRosa's case is not the first of its type in which the rule has been invoked to bar conviction for sexual assault

against a young child. . . . Because the rule may operate to obstruct justice, we conclude that abandoning it will do more good than harm. We are convinced that the corpus delicti rule is too rigid in its approach, too narrow in its application, and too capable of working injustice in cases where, as here, evidence of the corpus delicti is not only non-existent but impossible to uncover. See *Parker*, 337 S.E.2d at 494; *Mauchley*, [2003 UT 10] ¶ 46, 67 P.3d at 488. Thus, we abandon the corpus delicti rule because we hold that sound reasons exist for doing so." *People v. LaRosa*, 2013 CO 2, ¶ 31.

Other commentators and courts have criticized the formal corpus delicti rule because it is underinclusive; it applies only to confessions to imaginary crimes and is wholly inapplicable to the more common situation of a false confession to an actual crime. This occurs because the formal corpus delicti rule does not demand corroboration of the facts contained in the confession (such as the perpetrator's identity), only proof of injury and proof that the injury resulted from criminal means. *E.g.*, *Dang*, 267 Kan. at 208.

Thus the formal corpus delicti rule protects the person who confesses when there can be no independent showing of a harm or injury or independent proof that the injury was criminally caused. There being no proof of any crime, the crime is deemed to be imaginary. But if there is proof of a crime and a defendant confesses to having committed the crime, when in fact another person committed the crime, the formal rule offers no protection against the false confession. Observing this dichotomy, the New Jersey Supreme Court concluded: "There seems to be little difference in kind between convicting the innocent where no crime has been committed and convicting the innocent where a crime has been committed, but not by the accused." *State v. Lucas*, 30 N.J. 37, 57, 152 A.2d 50 (1959); see *LaRosa*, 2013 CO 2, ¶ 29; *State v. Parker*, 315 N.C. 222, 234, 337 S.E.2d 487 (1985).

Because of these many defects, Wigmore maintains that the corpus delicti rule is unnecessary and serves as a "positive obstruction to the course of justice." 7 Wigmore, Evidence § 2070, at 510 (Chadbourn rev. 1978). Most courts agree. See, *e.g.*, *LaRosa*, 2013 CO 2, ¶ 31 ("the rule may operate to obstruct justice"); *Lucas*, 30 N.J. at 58 ("safeguards for the accused should not be turned into obstacles whereby the guilty can escape just punishment"); *Mauchley*, 2003 UT 10, ¶ 28 ("In addition to failing to adequately protect

the innocent from the consequences of their false confessions, the corpus delicti rule potentially operates to obstruct justice.").

The authors of McCormick on Evidence explain that some of the formal rule's deficiencies have been brought on by changing circumstances:

"Application of the *corpus delicti* formulation may have been a relatively simple task that accomplished the purpose of the corroboration requirement when crimes were few and were defined in simple and concise terms. But modern statutory criminal law has increased the number and complexity of crimes. Simply identifying the elements of the *corpus delicti* thus provides fertile ground for dispute." 1 McCormick § 147, p. 815.

See *LaRosa*, 2013 CO 2, ¶ 27; *Parker*, 315 N.C. at 232-33; *Mauchley*, 2003 UT 10, ¶¶ 29-30; see also *Bishop*, 431 S.W.3d at 51 (discussing authorities criticizing rule on this grounds).

These problems compound the difficulties inherent in applying the formal rule. This has led to courts employing "workarounds" in order to achieve justice—and to some courts deciding that the workarounds and exceptions have wholly subsumed the formal rule:

"Because the rule is ill-equipped to adapt to the changing face of criminal law, courts are faced with either selectively applying the rule to certain crimes or abandoning it for all crimes. See *State v. Daugherty*, 173 Ariz. 548, 845 P.2d 474, 477-78 (Ct. App.1992) (excluding application of the corpus delicti rule to various crimes). We note that numerous exceptions can soon subsume a rule, however. Thus, we conclude the better approach is to abolish the rule rather than trying to 'work around the rule to achieve justice.'" *Mauchley*, 2003 UT 10, ¶ 45 (quoting Mullen, 27 U.S.F. L. Rev. at 417).

As a result, in recent years a growing number of courts have abandoned or modified the rule. See, *e.g.*, *Jacinth v. State*, 593 P.2d 263 (Alaska 1979); *LaRosa*, 2013 CO 2; *State v. Hafford*, 252 Conn. 274, 746 A.2d 150 (2000); *Harrison v. United States*, 281 A.2d 222 (D.C. 1971); *State v. Yoshida*, 44 Hawaii 352, 354 P.2d 986 (1960); *State v. Suriner*, 154 Idaho 81, 294 P.3d 1093 (2013); *State v. Heiges*, 806 N.W.2d 1 (Minn. 2011); *State v. True*, 210 Neb. 701, 316 N.W.2d 623 (1982); *State v. Zysk*, 123 N.H. 481, 465 A.2d 480 (1983); *State v. Reddish*, 181 N.J. 553, 859 A.2d 1173 (2004); *State v. Weisser*, 141 N.M. 93, 150 P.3d 1043 (Ct. App. 2006); *State v. Parker*, 315 N.C. 222, 337 S.E.2d 487 (1985);

*Stout v. State*, 693 P.2d 617 (Okla. Crim. App. 1984), *cert. denied* 472 U.S. 1022 (1985); *State v. Osborne*, 335 S.C. 172, 516 S.E.2d 201 (1999); *Bishop*, 431 S.W.3d 22; *Mauchley*, 2003 UT 10; *Holt v. State*, 17 Wis. 2d 468, 117 N.W.2d 626 (1962), *cert. denied* 374 U.S. 844 (1963); 1 McCormick § 148; Nissman & Hagen, Law of Confessions § 12.4 (2d ed. 2015); 7 Wigmore, Evidence § 2070, at 510; Moore, *Indiana's Corpus Delicti Rule: Time for A Change*, 41 Res Gestae 24 (August 1997); Mullen, *Rule Without Reason: Requiring Independent Proof of the Corpus Delecti as a Condition of Admitting an Extrajudicial Confession*, 27 U.S.F. L. Rev. 385 (1993); Comment, *California's Corpus Delicti Rule: The Case for Review and Clarification*, 20 U.C.L.A. L. Rev. 1055 (1973); Developments in the Law—*Confessions*, 79 Harv. L. Rev. 938 (1966); Note, *Confession Corroboration in New York: A Replacement for the Corpus Delicti Rule*, 46 Fordham L. Rev. 1205, 1235 (1978). *Contra Ex parte Slaton*, 680 So. 2d 909 (Ala. 1996), *cert. denied* 519 U.S. 1079 (1997); *State v. Carwise*, 846 So. 2d 1145 (Fla. 2003) (Cantero, J., dissenting); *Willoughby v. State*, 552 N.E.2d 462 (Ind. 1990); *People v. McMahan*, 451 Mich. 543, 548 N.W.2d 199 (1996); *Allen v. Commonwealth*, 287 Va. 68, 752 S.E.2d 856 (2014); *State v. Dow*, 168 Wash. 2d 243, 227 P.3d 1278 (2010).

### 3. *The Trustworthiness Standard*

Contributing significantly to the erosion of the formal corpus delicti rule, the United States Supreme Court, in the companion cases of *Smith v. United States*, 348 U.S. 147, 154-57, 75 S. Ct. 194, 99 L. Ed. 192 (1954), and *Opper v. United States,* 348 U.S. 84, 92-93, 75 S. Ct. 158, 99 L. Ed. 101 (1954), adopted for federal law purposes what has become known as the trustworthiness standard. In sum, the Court held that independent evidence corroborating a confession "need not be sufficient, independent of the statements, to establish the corpus delicti." *Opper*, 348 U.S. at 93. Rather, such evidence must merely "tend to establish the trustworthiness of the statement." 348 U.S. at 93. Then in *Smith*, 348 U.S. at 156, the Court further explained that "[a]ll elements of the offense must be established by independent evidence or corroborated admissions, but one available mode of corroboration is for the independent evi-

dence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused."

Thus, while the formal corpus delicti rule focuses on whether there is sufficient evidence of the body of the crime, rigidly severing a confession from the calculus, the trustworthiness standard looks to the totality of the circumstances to assess both whether the crime occurred and whether the confession was trustworthy—*i.e.*, reliable. Applying this standard, a reliable confession is itself sufficient evidence to establish the corpus delicti of the alleged offense.

The Court cited several reasons for adopting this alternative standard. First, the Court noted that "because this [corpus delicti] rule does infringe on the province of the primary finder of facts, its application should be scrutinized lest the restrictions it imposes surpass the dangers which gave rise to them." *Smith*, 348 U.S. at 153. Next, the Court focused on the factor present in Dern's case— the lack of a tangible injury. In *Smith*, a defendant appealed his conviction for tax evasion, a crime without a tangible injury that can be isolated as a corpus delicti. Addressing the difficulty of applying the traditional corpus delicti rule in that situation, the Court noted that typically the corpus delicti is established by proving that a loss or harm occurred and that the injury resulted from someone's criminal activity. But in a case where there is no tangible injury "it cannot be shown that the crime has been committed without identifying the accused. Thus we are faced with the choice either of [modifying the corroboration rule or] applying [it] to this offense and according the accused even greater protection than the rule affords to a defendant in a homicide prosecution" where the body killed by homicidal means provides a tangible corpus delicti. *Smith*, 348 U.S. at 154.

### 4. *The Trustworthiness Standard in Kansas*

Kansas has not been exempt from the general trend both criticizing the formal corpus delicti rule and—in the words of some critics—finding workarounds and exceptions to further the ends of justice.

As early as 1913, in *State v. Cardwell*, 90 Kan. 606, 135 P. 597 (1913), we began to depart from a strict adherence to the formal

corpus delicti rule. There, the defendant had confessed to the crime of raping his daughter. Upon conviction he appealed, claiming that his conviction violated the corpus delicti requirement. This court summarized the issue this way: "It will be observed that there was no direct evidence in court of the *corpus delicti*—that the crime had in fact been committed. . . . The case for the state rests upon extrajudicial admissions and upon circumstantial evidence as to these essential facts." 90 Kan. at 608. The *Cardwell* court noted "the reasonable rule that the law demands, and only demands, the best proof of the *corpus delicti* which, in the nature of the case, is attainable." 90 Kan. at 609. Applying this "reasonable rule," the *Cardwell* court held that the corpus delicti "may be established by evidence of admissions of guilt by the accused supported by circumstantial evidence tending to *corroborate the admissions*; provided all the evidence is sufficient in the estimation of the jury and trial court to establish the guilt of the accused beyond a reasonable doubt." (Emphasis added.) 90 Kan. at 609.

The *Cardwell* court's recitation of an alternative manner in which the corpus delicti could be established, while not couched in the terminology of trustworthiness, is remarkable in the way it foreshadows the United States Supreme Court decisions in *Smith* and *Opper*. Indeed, the *Cardwell* rule—that when the "nature of the case" so demands, the corpus delicti can be established by a "corroborate[d] ... admission[]" if in the totality of the circumstances the evidence is sufficiently reliable to "establish the guilt of the accused beyond a reasonable doubt"—mirrors the *Smith* trustworthiness rule that "corroborated admissions" standing alone can prove the corpus delicti "'through' the statements of the accused." See *Cardwell*, 90 Kan. at 609; *Smith*, 348 U.S. at 156.

In subsequent cases, this court has taken the alternate course charted in *Cardwell* to arrive at a prima facie finding of the corpus delicti. For example, in *State v. Long*, 189 Kan. 273, 369 P.2d 247 (1962), the requirements of the formal corpus delicti rule were fully met as to the charged crime of murder—investigators found the body of a woman, lying in a pool of blood, gagged, and stabbed 14 times. But the only evidence of the secondary charged crime of kidnapping—a crime without a tangible injury—was Long's extra-

judicial confession that he had abducted the victim at knifepoint from a bus stop. Observing that "[i]t is unnecessary to use a knife if a person goes willingly, and it also is unnecessary to gag one who goes willingly," the court held "[t]he circumstances here, together with the physical facts, considered in connection with the defendant's confession, were ample to support the conviction of the kidnapping charge." 189 Kan. at 276. These facts, however, most assuredly do not satisfy the formal corpus delicti rule. It is more accurate to say that the factual circumstances discussed in *Long* "[made] the admission reliable, thus corroborating it . . . [and] the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth.» *Opper*, 348 U.S. at 93. In other words, the facts rendered Long's confession sufficiently "corroborated" and "trustworthy" to permit the jury to consider that confession in the totality of the circumstances to find the corpus delicti—*i.e.*, that the crime of kidnapping had actually been committed.

Other courts have described cases and outcomes similar to *Long* as a "multiple crimes" exception to the formal corpus delicti rule wherein the facts establishing the formal corpus delicti for one crime can "overlap" and also establish the corpus delicti of another crime so long as it was committed simultaneously or in an uninterrupted course of criminal conduct. See 1 McCormick § 146, p. 812 n.19, p. 813 n.20 (citing cases involving a burglary that corroborated proof of an intent to commit a crime once unlawful entry was gained; homicide corroborated related robbery, kidnapping, and conspiracy; physical evidence of anal and vaginal sexual activity corroborated confession to oral conduct; possession of multiple baggies of cocaine corroborated intent to distribute). But we agree with the Arizona Court of Appeals' candid acknowledgment that the so-called multiple crimes exception is "in essence, a trustworthiness approach for closely related offenses." *State v. Morgan*, 204 Ariz. 166, 171, 61 P.3d 460 (Ct. App. 2002).

Finally, following *Cardwell* and cases such as *Long*, we have expressly and favorably acknowledged the trustworthiness standard from *Smith* and *Opper*. In *State v. Tillery*, 227 Kan. 342, Syl. ¶ 2, 606 P.2d 1031 (1980), we held that an "uncorroborated extrajudicial

confession is insufficient to sustain a conviction," citing both *Opper* and *Cardwell* as our authority for this proposition. While the holding is couched in the negative, when understood in conjunction with the authority cited, the holding can just as forcefully be stated in the positive: when an extrajudicial confession *is* corroborated, it *is* sufficient to sustain a conviction because the corpus delicti has been demonstrated "through" the trustworthy confession itself.

What some critics of courts' different approaches to the difficulties surrounding the formal corpus delicti rule have described as "workarounds" could just as easily be characterized as finding an alternative path to the same end. And that is how we choose to describe the development and application of the trustworthiness standard in Kansas. Indeed, in Kansas, that alternative course was mapped over a century ago with our recognition in *Cardwell* of the "reasonable rule that the law demands, and only demands, the best proof of the *corpus delicti* which, in the nature of the case, is attainable" and may consist only of a "corroborate[d] ... admission[]." 90 Kan. at 609. We have stayed that course when dealing with crimes that produced no tangible injury in cases such as *Long*—despite our dogmatic assertion that we were applying the formal rule. And we cemented the availability in Kansas law of this alternative course with our citation to and application of the trustworthiness standard in *Tillery*.

Given this history, we find that Kansas common law has long provided an alternative path for the State to take when making its prima facie showing of the alleged crime's corpus delicti when the nature and circumstances of that crime are such that it did not produce a tangible injury. That alternative route is a trustworthy confession or admission to crimes that do not naturally or obviously produce a tangible injury easily susceptible to physical proof. The unfortunate fact that our longstanding recognition of this method of showing the corpus delicti has all too often been obscured by our previous insistence on reciting the formal rule even when inapplicable is remedied today.

A determination of trustworthiness will depend on the totality of the circumstances and may include a consideration of the following nonexclusive factors or indicia of reliability: (1) independent cor-

roboration of details or specific facts contained in the confession; (2) the number of times the confession was made and the consistency or lack thereof between different versions of the confession; (3) the circumstances of the confession, including the identity of the person or persons to whom the confession was made and the state of mind of the defendant at the time of the confession; (4) the availability of the facts or details contained in the confession from sources outside the defendant's personal knowledge; (5) the defendant's age, education, experience, and mental health; and, (6) if the confession was made to law enforcement, then the overall fairness of the exchange including whether there was deception, trickery, undue pressure, or excessive length.

The evidentiary standard for finding a confession or admission sufficiently trustworthy to satisfy the State's obligation to present a prima facie showing of the corpus delicti is akin to the standard of review applicable to sufficiency of the evidence claims—*i.e.*, it asks whether, viewed in the light most favorable to the prosecution, the totality of the circumstances is such that a rational factfinder could, considering all of the evidence, find beyond a reasonable doubt that the charged crime actually occurred. See *Cardwell*, 90 Kan. at 608 (applying a sufficiency of the evidence standard). It must be noted that the State carries a higher burden when establishing the corpus delicti through a trustworthy confession than it otherwise would if establishing the corpus delicti through the traditional means of evidence entirely independent of the defendant's statements. See, *e.g.*, *State v.Waddell*, 255 Kan. 424, 433, 874 P.2d 651 (1994) (When applying the formal corpus delicti rule, the State's burden is met if "there is some evidence which renders the corpus delicti more probable than it would be without the evidence.") (quoting *State v. Bradford*, 254 Kan. 133, 139, 864 P.2d 680 [1993]).

*Applying the trustworthiness rule in Dern's case*

As explained above, independent of Dern's statements, the evidence here is insufficient to establish that the charged crime—aggravated indecent liberties against C.D.—is more likely than not to have occurred. Thus the State must follow the alternative path we have described to establishing the corpus delicti through a trust-

worthy confession or admission to a crime that has not naturally or obviously produced a tangible injury.

After careful review of the entire record, we have no difficulty concluding that here, considering the totality of circumstances, Dern's confessions were supported by sufficient indicia of reliability to permit the corpus delicti of the charged crime to be shown through those statements. In this case, we need not pursue the analysis of trustworthiness beyond the first and most significant factor we have identified—independent corroboration of the facts of the confession. Here, Dern confessed to multiple closely related criminal acts against his twin daughters. Certain essential facts of that confession—namely, the facts establishing the crimes against F.D.—were corroborated by independent evidence. This corroboration was more than sufficient to cloak Dern's entire confessional statement with reliability and trustworthiness, thus establishing the corpus delicti of the alleged crimes against C.D. through those statements.

## CONCLUSION

We affirm Dern's two convictions for aggravated indecent liberties with a child and the consecutive life sentences imposed for them. We reverse both aggravated criminal sodomy convictions because the jury was improperly instructed on alternative means of committing that crime without supporting evidence for each means presented to the jury, and the Court of Appeals panel erroneously applied the invited error doctrine to affirm those convictions.

\* \* \*

BILES, J., concurring in part and dissenting in part: I write separately to concur and dissent regarding two concerns: (1) what I see as the majority's expansion of the corpus delicti rule; and (2) our court's decision not to apply a harmless error analysis when there is an alternative means error.

### Corpus Delicti Rule

First, on the corpus delicti issue, my reading of our caselaw is that this court has not previously adopted or applied the so-called

"trustworthiness" standard embraced today by the majority to affirm Dern's conviction regarding C.D. But we can, and should, affirm Dern's conviction using the multiple crimes exception to the formal corpus delicti rule applied in *State v. Long*, 189 Kan. 273, 276, 369 P.2d 247 (1962), because this is more than a difference in semantics. The multiple crimes path makes it unnecessary to consider whether the majority's trustworthiness standard raises due process concerns by applying a new judicial rule to affirm this conviction. See *People v. LaRosa*, 2013 CO 2, ¶ 45, 293 P.3d 567 (2013) (application of newly adopted trustworthiness standard to the defendant's case on appeal would violate due process).

Admittedly, as the majority opinion notes, this court's earliest caselaw does not clearly articulate how to treat extrajudicial confessions or admissions. But our modern caselaw unequivocally does adopt the traditional requirement that "[t]he State's prima facie showing of corpus delicti must be made independently of admissions or confessions of a defendant." *State v. Dang*, 267 Kan. 198, 208, 978 P.2d 277 (1999) (citing *State v. Pyle*, 216 Kan. 423, 432, 532 P.2d 1309 [1975]); see also, *e.g.*, *Waddell*, 255 Kan. at 432-33 ("A conviction will be upheld if tangible corpus delicti evidence is proved outside that of the confession."); *Bradford*, 254 Kan. at 139 (adopting analysis that "evidence independent of appellant's confession was required to show that his victim had been kidnapped"); *Grissom*, 251 Kan. at 880 (corpus delicti "'must be established independently of admissions or confessions of the defendant'"); *State v. Brown*, 236 Kan. 800, 804, 696 P.2d 954 (1985) (corpus delicti for child abuse established by "sordid circumstantial evidence showing excessive neglect and abuse of the victim"); *State v. Higdon*, 224 Kan. 720, 723, 585 P.2d 1048 (1978) (holding "evidence, independent of the appellant's confession, established the Corpus delicti of the crime of rape"); *Pyle*, 216 Kan. at 432 ("'The elements [of the corpus delicti of murder] must be established independently of admissions or confessions of the defendant . . . .'").

Using that rubric, this court's decision in *Long* provides an established exception to the formal corpus delicti rule that is applicable in Dern's cases. As mentioned by the majority, the *Long* court faced a corpus delicti issue involving a kidnapping that was closely

associated with a first-degree murder charge. While there was additional evidence of the murder, the only evidence of the kidnapping was the defendant's extrajudicial confession. This court held that the independent evidence of the murder, *i.e.*, the location and condition of the victim's body, was sufficient to corroborate the defendant's confession to both crimes. *Long*, 189 Kan. at 274-76.

The *Long* court's analysis embodies what has been recognized elsewhere as an exception to the formal corpus delicti rule. See, *e.g.*, *State v. Morgan*, 204 Ariz. 166, 172-73, 61 P.3d 460 (Ct. App. 2002) (evidence established commission of several sexual crimes closely related to sexual conduct, although evidence did not show one particular incident absent confession); *Willoughby v. State*, 552 N.E.2d 462, 467 (Ind. 1990) (temporal relationship between the offenses sufficiently proximate that introduction of extrajudicial confession did not violate policies supporting corpus delicti rule); *Miller v. State*, 457 S.W.3d 919, 927 (Tex. Crim. 2015) (when the temporal relationship between the offenses is sufficiently proximate, introduction of the extrajudicial confession does not violate policies underlying the corpus delicti rule).

As it relates to Dern, *Long* demonstrates that the facts proving multiple crimes occurred as part of the same course of conduct or transaction can satisfy the formal corpus delicti rule. In other words, Dern simultaneously confessed to the crimes against F.D. and C.D., and those crimes are so closely related that they are part of the same course of conduct. Under those circumstances, F.D.'s statements sufficiently establish the corpus delicti for the crimes against both her and C.D. To hold otherwise would require an unrealistic parsing of words from the same confessions deemed admissible as to the charges involving F.D. and any concerns that the statements Dern made about C.D. were untrue are eliminated.

I want to be clear that I do not reach this view because I want to champion the formal corpus delicti rule. I agree many of the criticisms outlined in the majority's decision to the formal rule have merit. But for me, there is an inescapable due process concern in the approach the majority takes because application of the formal rule for many years by this court should prevent us from applying a trustworthiness rule now to affirm Dern's conviction on this

count—even if it is a better rule going forward. See *LaRosa*, 2013 CO 2, ¶ 45. Using the multiple crimes exception applied in *Long* does not raise the same due process issue.

*Alternative Means*

Second, as to the alternative means issue, I believe the error in the aggravated criminal sodomy instruction was harmless. Although this is a view I have not embraced in earlier cases, I have come around to accept Justice Moritz' analysis that an alternative means error may be harmless if no evidence was presented about one means—so long as sufficient evidence was presented of another. See *State v. Brown*, 295 Kan. 181, 227, 284 P.3d 977 (2012) (Moritz, J., concurring).

In Dern's case, there was at least some evidence as to each of the three alternative means that constituted aggravated criminal sodomy, except for the jury instruction about sexual intercourse with an animal. But no one can reasonably argue there was the slightest possibility of jury confusion under these circumstances as to this particular alternative mean for committing aggravated criminal sodomy. This makes reversal unjust, as explained by Justice Moritz in her concurrence. See also Mott, *Alternative Means Jurisprudence in Kansas: Why Wright is Wrong*, 62 U. Kan. L. Rev. 53, 90-91 (2013).

To be sure, the inclusion of irrelevant "means" in a jury instruction (such as animal intercourse in this child sex case) is a senseless and bewildering error. But automatic reversal is equally nonsensical. Adoption of a harmless error test for these situations would ensure justice is done.

In this case, the State did not present a harmless error argument and that is understandable given our prior holdings on this issue to the contrary. But perhaps the day will come when we have an opportunity to revisit our alternative means jurisprudence.

\* \* \*

JOHNSON, J., concurring in part and dissenting in part: I join that portion of Justice Biles' concurrence and dissent addressing the corpus delicti rule, but with one addition. In June 2010, the

month before the July 29, 2010, incident, C.D. told her mother that she had "seen 'daddy's peepee,'" albeit no further inquiry ensued at that time. The further inquiry in July was prompted by a similar statement by F.D. to her mother, to-wit: "I saw daddy's peepee." Then, after F.D. had expounded on the sexual abuse that had occurred the night before, C.D. made the following statement: "Daddy just made me sad, and I don't want to see that again." In the context of both her own prior statement and her sister's contemporaneous statements, C.D.'s statement provides an additional basis upon which to draw a justifiable inference that the crime against C.D., to which the defendant confessed, did, in fact, occur.

Turning to the issue of alternative means, I agree with both the majority and Justice Biles that the State's failure to argue harmless error precludes us from reconsidering our caselaw on this matter. Slip op. at 19-20; slip op. at 40 (Biles, J., concurring). And, like Justice Biles, I am open to further discussion on whether an alternative means error can ever be a harmless error. *Cf. State v. Wright*, 290 Kan. 194, 224 P.3d 1159 (2010) (absence of sufficient evidence on all charged alternative means requires reversal). I write separately to clarify that I do not embrace the modified harmless error approach championed by Justice Moritz in *State v. Brown*, 295 Kan. 181, 227, 284 P.3d 977 (2012) (Moritz, J., concurring). Slip op. at 39 (Biles, J., concurring).

Under the proposed modified approach, "the rule enunciated in *Wright*—e.g., that when there is insufficient evidence of at least one alternative means, the conviction must be reversed—comes into play only when there is sufficient evidence of one means and some, but insufficient, evidence of another means." 295 Kan. at 224 (Moritz, J., concurring). But "when a jury is presented with *no* evidence of one means and sufficient evidence of another" the error is harmless because "we can reliably conclude the jury was not confused and that it unanimously decided the defendant's guilt based upon the *only* means for which there was evidence." 295 Kan. at 222 (Moritz, J., concurring).

This line of reasoning, however, was rejected by the United States Supreme Court in *Griffin v. United States*, 502 U.S. 46, 112 S. Ct. 466, 116 L. Ed. 2d 371 (1991), which, ironically, the State of-

ten relies upon as support for the argument that *Wright* was wrong. In *Griffin*, the defendant attempted to distinguish *Turner v. United States*, 396 U.S. 398, 420, 90 S. Ct. 642, 24 L. Ed. 2d 610 (1970), where the Court held: "'[W]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged.'" 502 U.S. at 56-57. Griffin argued *Turner* only applies when an alternative means is supported by *no* evidence; Griffin contrasted this scenario from cases where the alternative means is supported by *some*, but insufficient, evidence. The Court rejected this argument, stating that "[b]esides producing an odd system in which the greater failure of proof is rewarded, the rule seems to us full of practical difficulty, bereft of support in *Turner*, and without foundation in the commonlaw presumption upon which *Turner* is based." 502 U.S. at 58.

Moreover, applying any version of harmless error to a circumstance that is characterized as a sufficiency of the evidence problem could well be constitutionally infirm. See *Wright*, 290 Kan. at 205 (quoting Beier, *Lurching Toward the Light: Alternative Means and Multiple Acts Law in Kansas*, 44 Washburn L.J. 275, 299 [2005] [applying harmless error analysis to sufficiency of the evidence errors violates "'a most basic guarantee of due process in criminal cases'"]). Accordingly, any renewed discussion of the holdings in *Wright* will require more depth than a new, customized harmless error rule. *Cf.* Mott, *Alternative Means Jurisprudence in Kansas: Why* Wright *is* Wrong, 62 Kan. L. Rev. 53, 75 (2013) (discussing recharacterization of an alternative means issue as an instructional error, rather than sufficiency of evidence error, thereby permitting application of Kansas harmless error statute).