NOT DESIGNATED FOR PUBLICATION

No. 113,724

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TYJUNA M. SHARKEY,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; WARREN M. WILBERT, judge. Opinion filed May 25, 2018. Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., PIERRON and STANDRIDGE, JJ.

PER CURIAM: On September 26, 2006, the State charged Tyjuna M. Sharkey with three counts of aggravated indecent liberties with a child: one count involved his stepdaughter, K.S., one count involved another stepdaughter, L.S., and one count involved L.S.'s friend, T.W. The conduct involving K.S. and L.S. had allegedly occurred in 2001 or 2002, while the incident involving T.W. occurred during a sleepover with L.S. at Sharkey's house on September 10, 2006.

1

K.S., L.S., and T.W. all testified at trial. The State presented a DNA expert who linked semen found on T.W.'s pajamas to Sharkey. The jury convicted Sharkey of two counts of aggravated indecent liberties with a child, but it acquitted him of the count involving L.S. After trial, Sharkey sought and was granted a new trial when additional DNA testing showed there were at least two other DNA profiles other than Sharkey's and T.W.'s in the sample taken from T.W.'s pajamas.

The district court originally appointed Michael Brown to represent Sharkey at his second trial, but Sharkey filed a motion requesting new counsel, complaining that Brown had failed to communicate with him and was not preparing for trial. Sharkey had also filed a similar motion regarding his first trial counsel's performance. The court then appointed Gary Owens to represent Sharkey.

The State eventually dismissed the count of aggravated indecent liberties involving K.S., so the second trial focused on the count involving T.W. On the first day of trial, both T.W. and L.S. testified that they had gone together to a skating rink on the night of September 10, 2006, then returned to L.S.'s home. The girls went to sleep on the floor of the living room. T.W. woke up to find Sharkey next to her, pulling down her pajama bottoms and trying to force his penis between her buttocks. She pushed Sharkey off and ran into the bathroom. At this point, L.S. woke up and saw Sharkey getting up off the floor. She then fell back asleep. After Sharkey went to his bedroom, T.W. returned to the living room. She woke up L.S. and told her what had happened. The girls stayed in L.S.'s bedroom the rest of the night.

The next morning they told L.S.'s mother what had happened. Mother took T.W. home and reported the incident to T.W.'s mother. Nobody called the police until the next day when T.W. told a school counselor what had happened. When police went to T.W.'s home, they collected the pair of pajama bottoms T.W. had been wearing the night of the incident. The pajama bottoms had been sitting in a dirty clothes hamper in T.W.'s room.

2

Mother, who was married to Sharkey at the time of the incident, also testified on the first day of trial. She said she had filed for divorce from Sharkey earlier in 2006, but their relationship was fine by September. She was not aware of any problems between Sharkey and L.S. and did not remember an incident in which Sharkey took L.S.'s cellphone away. She acknowledged that K.S. was disobedient and would rebel when Sharkey tried to discipline her. L.S. testified that everything was okay at home and neither she nor Mother were having any problems with Sharkey.

Finally, the State's DNA expert, Shelly Steadman, testified. She told the court that semen was found on the back of T.W.'s pajamas, and the DNA profile taken from the semen was consistent with Sharkey's DNA profile. Analysis of non-sperm DNA taken from the pajamas was consistent with Sharkey and T.W. Steadman also explained that there was an indicator of DNA which did not belong to Sharkey or T.W., but due to the specifications of her testing equipment, she could not say if it signified another contributor or was simply "noise" produced during the testing process.

At the start of the second day of trial, Sharkey asked to represent himself because his counsel, Owens, had not asked the questions during cross-examination that Sharkey wanted him to. The district court "strongly urge[d] [Sharkey] to reconsider," noting Sharkey's unfamiliarity with trial procedure and the rules of evidence. The court added that Sharkey could request that Owens ask certain questions. Owens stated that Sharkey had in fact done this, but Owens declined to ask some questions "for tactical and strategic reasons." He added that, "I believe I am at loggerheads with Mr. Sharkey over that issue. I have tried to discuss what I'm doing and why I'm doing it and, again, he is not agreeing to that." At the court's urging, Sharkey agreed to continue with counsel instead of proceeding pro se.

Detective Teal Pallivan was the last witness for the State. He testified Sharkey denied T.W.'s accusation and told Pallivan that his stepdaughters had never liked him and they must be using T.W. to conspire against him.

The defense called one witness, Brian Wraxall, a forensic serologist. Wraxall testified the DNA profile taken from the semen on the pajama bottoms matched Sharkey, and both Sharkey and T.W. were included as possible primary donors of the non-sperm DNA. His analysis of the DNA evidence suggested the presence of at least one other secondary contributor other than Sharkey and T.W. He stated the third contributor could be Mother or her son, A.S. He suggested the DNA sample could be postcoital discharge from Sharkey and Mother having sex, and the fluids could have been transferred to T.W.'s pajamas. In closing argument, Owens suggested Sharkey and Mother had sex in the living room and that is how Sharkey's semen ended up on T.W.'s pajamas.

The jury convicted Sharkey of one count of aggravated indecent liberties with a child. Because T.W. was under 14 at the time of the crime, the district court sentenced Sharkey to life imprisonment with no possibility of parole for 25 years under K.S.A. 21-4643. Following the verdict, Sharkey filed two pro se motions, alleging Owens had provided ineffective assistance of counsel.

In one motion labeled "Pro Se Motion for Re-Trial," Sharkey argued that Owens had kept him "in the blind" throughout the trial and had failed to inform him about all developments in the case. Sharkey alleged he had been "hoodwinked" into believing it was Owens' strategy not to call family members who could have testified regarding "the nature of the madness that was happening in the year of '2006'" and the "rocky relationship I had with my x wife and those girls." He complained that Owens had only objected twice during the trial and had not objected when the State's DNA expert "had to go back and re-state her statement." Sharkey further claimed that he had been "hoodwinked into not taking the stand."

4

In his other motion, labeled "Pro se Motion for Re-Appointment of Counsel," Sharkey alleged that Owens had failed to properly prepare him for trial. He also claimed Owens failed to investigate or present witnesses who could have rebutted "the victim[']s claims that there was no problems within the relationship at this time." Sharkey asked the court to "grant me a fair trial in a way that is fair to both parties."

At a joint motions and sentencing hearing, the district court addressed and denied Sharkey's pro se motions without appointing new counsel to represent Sharkey on those motions. Sharkey appealed, and the Kansas Supreme Court held Sharkey had been denied assistance of counsel at a critical stage of the criminal proceedings. *State v. Sharkey*, 299 Kan. 87, 101, 322 P.3d 325 (2014). The case was remanded with instructions to hold a new hearing on Sharkey's pro se new-trial motions with new conflict-free counsel appointed to argue the motions. 299 Kan. at 101.

After a remand hearing, the district court again denied Sharkey's motions for new trial, finding there was no ineffective assistance of counsel. Sharkey appealed. While his appeal was pending, he filed a motion asking this court to remand for a hearing under *State v. Van Cleave*, 239 Kan. 117, 119-20, 716 P.2d 580 (1986), to determine if the attorney who represented Sharkey at the remand hearing, Steve Wagle, had also been ineffective. This court granted the motion.

At the *Van Cleave* hearing, both parties stipulated that Wagle had performed deficiently at the remand hearing. Thus, the only issue that remained was whether Wagle's deficient performance prejudiced Sharkey. Any possible prejudice, however, turned on whether Owens was ineffective or not. So, the primary issue at the hearing was Owens' representation at trial.

5

Sharkey testified at the hearing that he discussed trial strategy with Owens. According to Sharkey's understanding, the defense theory was that Mother had set him up. Sharkey stated he had gotten out of prison shortly before the incident involving T.W. and had been arguing with Mother. He also said that his relationship with his stepchildren was "kind of rough" after he got out of prison. He pointed to several incidents involving three of Mother's children, A.S., K.S., and L.S. Sharkey recalled one time when he and A.S., who was 16 at the time, had been playing around boxing. A.S. hit Sharkey too hard, and Sharkey chased A.S. out into the street and knocked him down. Sharkey also got into an argument with L.S., who was 11 at the time, because someone was "sexting" her on her cellphone. L.S. would not tell Sharkey who was sending the messages, so he broke her cellphone and threw it away.

Sharkey also testified he did not get along with K.S. In one incident, he learned that K.S. was at a "party drug house." Sharkey felt that this was inappropriate because K.S. was only 14 at the time. He "went over there and rushed through the door and . . . grabbed her out of there while she was . . . kicking and punching and . . . dragged her out of there." Another time, K.S. tried to hit Sharkey when she was drunk, and Sharkey physically restrained her.

Sharkey stated that Owens had not interviewed any of the children. He also said he told Owens about other family members who were present for all of these incidents. These included Mother's oldest daughter, her partner, and Mother's brother. Owens did not speak with any of Sharkey's proposed witnesses or call them at trial.

Sharkey told the court that Owens would not let him testify. He stated that Owens told him not to testify because the prosecutor would bring up his criminal record and would "tear [him] apart." Sharkey explained that he asked to represent himself during trial because Owens was not presenting evidence and would not let him testify. He admitted, however, that he probably told the court that it was his decision not to testify.

6

Owens testified that he had decided to focus on the DNA evidence because that was why the first trial was overturned. He could not deny that Sharkey's DNA and semen were on the pajama bottoms, so he chose to emphasize a possible third contributor. He added that putting on a witness can sometimes hurt a defendant because the defendant has the presumption of innocence and the State has the burden of proof, so he generally preferred to present his defense through cross-examination.

Owens testified he had difficulty communicating with Sharkey because Sharkey was often reticent and terse. Owens discussed strategy with Sharkey, particularly the DNA evidence, but Sharkey said he did not care about the DNA, and he "would state that people were lying." Owens also explained to Sharkey that the defense would primarily be highlighting inconsistencies in cross-examination. According to Owens, they never discussed calling any individual to testify, and Sharkey did not provide any information regarding specific witnesses.

Owens said he did not find anything in discovery or the first trial transcript to suggest animosity between Sharkey, Mother, and her daughters. Owens only knew about possible problems between Sharkey and K.S. Owens stated he did not talk to the daughters about what had happened. He also did not do any additional investigation into possible family problems or interview any family members. Owens said that if he had had evidence of problems within the family, he would have investigated it.

Owens also testified he had advised Sharkey not to testify but it was "categorically untrue" that he prevented Sharkey from doing so. He told Sharkey that in his professional opinion Sharkey should not testify and it might hurt his case if he did testify. Owens said that he always stresses to his clients that it is ultimately their decision.

The district court found that Owens' decision to focus on the DNA evidence was a reasonable strategic choice. The court noted that Sharkey had not presented any witnesses at the hearing, so the court could not evaluate what effect those witnesses might have had on the outcome of the trial. Rather, the court was left only with Sharkey's speculation as to what any proposed witnesses might have said. Weighing those speculative statements against the DNA evidence, however, the court could not find that the evidence of family conflict and an implied conspiracy would have been enough to change the outcome of the trial. The court also found that based on Owens' testimony, Owens advised Sharkey not to testify but did not prevent him from doing so. Accordingly, the court denied Sharkey's motion alleging ineffective assistance. Sharkey appeals.

We must address the issue of whether Sharkey's trial counsel provided ineffective assistance.

Sharkey has brought claims against Owens, his trial counsel, and Wagle, counsel at his first remand hearing. Both parties stipulated at the *Van Cleave* hearing that Wagle's performance had been deficient, so the only issue at that hearing was whether Wagle's performance prejudiced Sharkey. This required the district court to determine if Sharkey would have prevailed on his ineffective assistance claim against Owens but for Wagle's performance. Thus, the ultimate issue on appeal is whether Owens was ineffective. Both parties limit themselves to arguing this issue.

A claim alleging ineffective assistance of counsel presents mixed questions of fact and law. When the district court conducts a full evidentiary hearing on such claims, the appellate courts determine whether the district court's findings are supported by substantial competent evidence and determine whether the factual findings support the court's legal conclusions. The appellate courts apply a de novo standard to the district court's conclusions of law. *Fuller v. State*, 303 Kan. 478, 485, 363 P.3d 373 (2015).

8

To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish (1) that the performance of defense counsel was deficient under the totality of the circumstances, and (2) prejudice, i.e., that there is a reasonable probability the jury would have reached a different result absent the deficient performance. *Sola-Morales*, 300 Kan. at 882.

Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel is highly deferential and requires consideration of all the evidence before the judge or jury. The reviewing court must strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). If counsel has made a strategic decision after making a thorough investigation of the law and the facts relevant to the realistically available options, then counsel's decision is virtually unchallengeable. Strategic decisions made after a less than comprehensive investigation are reasonable exactly to the extent a reasonable professional judgment supports the limitations on the investigation. *State v. Cheatham*, 296 Kan. 417, 437, 292 P.3d 318 (2013) (citing *Strickland v. Washington*, 466 U.S. 668, 690-91, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 [1984]).

Sharkey argues that Owens' performance was deficient because the limitations on Owens' investigation into possible family strife between Sharkey, Mother, and her daughters were unreasonable. He argues Owens lacked the information necessary to make a strategic decision because he did not conduct any form of investigation. Because his investigation was inadequate, any decision not to call witnesses cannot be considered trial strategy.

Admittedly, Owens testified that he did not conduct any investigation into possible family conflicts other than reviewing discovery and the first trial transcript. He explained that he declined to do so because he did not see anything in discovery or the trial transcript to suggest problems between Sharkey, Mother, and her daughters. He also

stated that Sharkey was difficult to communicate with and did not provide any information regarding possible witnesses. Instead, Owens chose to focus on the DNA evidence because that had resulted in the reversal of Sharkey's first trial.

Owens' testimony conflicted with Sharkey's. Sharkey testified that he told Owens about the family problems and gave the names of possible witnesses. In its ruling, the district court declined to resolve the conflicts in their testimony, instead emphasizing Owens' decision to focus solely on the DNA evidence rather than attempting to incorporate Sharkey's conspiracy theory. The court explained that attorneys must make decisions on what the most viable defense theory may be in a given case, and here the DNA evidence was the most compelling, given the difficulty of proving a family conspiracy.

However, based on Sharkey's allegations of family conflict, Owens could have surmised he needed to interview some family members to establish the viability of any such defense. Owens also said he was aware of some problems between Sharkey and K.S. Additionally, part of Owens strategy was to impeach the victim and other witnesses, but focusing on the DNA evidence alone would not have prepared him to do this. Thus, the limitations on his investigations may not have been reasonable and could support an argument for deficient performance. Nevertheless, Sharkey's allegations of ineffective assistance still fail because he cannot establish prejudice.

Sharkey is unable to satisfy the second prong of the *Strickland* test for a number of reasons. First, he did not actually call any of the witnesses he mentioned in his testimony. He only stated what he believed they might testify to. This is relevant because Sharkey bears the burden of establishing Owen's ineffectiveness. See *Fuller,* 303 Kan. at 486. Because Sharkey did not call any other witnesses, the district court was left with Sharkey's speculations about their potential testimony. Speculation is generally insufficient to meet the burden of proof to establish prejudice. See *Mullins v. State*, 30

10

Kan. App. 2d 711, 719, 46 P.3d 1222 (2002). Without knowing what the witnesses' testimony would have actually been, there is no way to definitively determine what effect it would have had on the outcome of the trial.

Second, the witnesses Sharkey wanted Owens to call did not have any direct evidence of a conspiracy by Mother or her daughters to set him up. According to Sharkey, the witnesses would only present evidence of a possible motive for framing him. He did not claim that any of the witnesses had any knowledge of an actual conspiracy on the part of Mother, her daughters, or both. The testimony of the proposed witnesses would also not have explained why T.W., who was 12 at the time of the crime, would have agreed to participate in any such scheme. Finally, their testimony would not have explained how Sharkey's semen ended up on T.W.'s pajamas. Evidence presenting a possible motive for such a conspiracy could have provided some support for Sharkey's defense theory. Nonetheless, given the strength of the evidence against Sharkey and the improbable nature of the conspiracy theory, such evidence would probably not have affected the verdict.

Third, any testimony from Sharkey's proposed witnesses might have done as much harm as good. Sharkey essentially wanted to introduce evidence that he had been involved in physical arguments and violent altercations with his preteen and teenage stepchildren and these incidents may have provided a motive for Mother or her daughters to set him up. But it also had the potential to paint Sharkey in a bad light and prejudice the jury against him. Thus, any possible deficiency in Owens' performance did not prejudice Sharkey.

In conclusion, the district court did not err in finding Owens had provided adequate representation. Substantial competent evidence supported the court's finding that Owens reasonably limited his investigation of Sharkey's allegations of family problems and a possible conspiracy. The court also did not err in finding any possible

11

deficiency did not prejudice Sharkey. Sharkey did not present any evidence at the hearing which would suggest a reasonable probability of a different verdict.

The district court did not specifically rule on Sharkey's claim against Wagle. However, Sharkey did not object to the lack of findings. When no objection is made to a district court's inadequate findings of fact or conclusions of law, an appellate court can presume the district court found all facts necessary to support its judgment. *State v. Dern*, 303 Kan. 384, 394, 362 P.3d 566 (2015). Because the district court denied Sharkey's motion, we can presume that the court also found Wagle's deficient performance did not prejudice Sharkey. This finding is affirmed as it is dependent on the success of Sharkey's claim against Owens, and that claim ultimately fails.

Affirmed.