No. 126,940

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

HENRY REYNOLDS,
*Appellant*.

SYLLABUS BY THE COURT

1.

Under the formal corpus delicti ("body of the crime") rule, the State is required to show the existence of a crime independently of an extrajudicial confession by the defendant. Recognizing that false confessions do occur for a variety of reasons, courts use this rule when the only evidence of a crime is the defendant's confession.

2.

When applying the formal corpus delicti rule, the State's burden is met if there is some evidence which renders the corpus delicti more probable than it would be without the evidence.

3.

Kansas does not follow the formal corpus delicti rule for crimes that produce no tangible injury. The law only demands the best proof of the corpus delicti which is attainable given the nature of the crime. Under these circumstances, the State may show the corpus delicti through a trustworthy confession.

4.

Under the Kansas corpus delicti rule (opposed to the formal corpus delicti rule), the State carries a higher burden than the more probable than not standard when establishing the corpus delicti solely through a trustworthy confession.

5.

The Due Process Clause protects against involuntary confessions: (1) that are inherently coercive and a per se violation of the Due Process Clause and (2) where a state actor uses interrogation techniques that because of the unique circumstances of the suspect are coercive.

6.

Unlike the aim of the corpus delicti rule to prevent convictions upon false confessions, the aim of due process is to prevent fundamental unfairness in the use of confessions whether true or false.

7.

The State bears the burden of proving by a preponderance of the evidence that an individual voluntarily, intelligently, and knowingly waived rights guaranteed by the Fifth Amendment and voluntarily—that is based on the person's unfettered will—made a statement. In that vein, the State must establish that police or other state actors did not intimidate, coerce, deceive, or engage in other misconduct that, when considered in the totality of the circumstances, was the motivation for the individual to make a statement.

8.

Coercive police activity is a necessary predicate to a finding that a confession is involuntary. And there must be a link between the coercive police activity and the resulting confession.

9.

An officer's exaggeration of the reliability of the Computer Voice Stress Analysis (CVSA) to identify the "truth" is deceptive. Although deceptive practices by law enforcement do not always constitute misconduct, if law enforcement uses the CVSA as subterfuge to trick or otherwise induce a defendant into a false confession, it can result in the confession being deemed involuntary.

10.

There is a key distinction between reliability and voluntariness. The reliability of a confession has nothing to do with its voluntariness. Proof that the defendant committed the crime to which he or she has confessed is not to be considered in deciding whether a defendant's will has been overborne and therefore the confession involuntary. A confession can be trustworthy, but still involuntary.

11.

Likewise, a confession could be untrustworthy, yet still voluntary. This would come into play when there is no tangible injury and the State is required to prove that the confession, its sole evidence, is trustworthy. If it cannot establish trustworthiness, then it does not matter if it was voluntary.

12.

Both trustworthiness and voluntariness must be determined from the totality of the circumstances. This entails consideration of factors relating to the nature of the interrogation and the characteristics of the accused.

Appeal from Coffey District Court; TAYLOR J. WINE, judge. Submitted without oral argument. Opinion filed February 7, 2025. Conviction reversed and sentence vacated.

*Sam Schirer*, of Kansas Appellate Defender Office, for appellant.

*Tyler W. Winslow*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., GARDNER and COBLE, JJ.

ARNOLD-BURGER, C.J.:  Henry Reynolds appeals his conviction for aggravated indecent liberties with a child. He claims there was insufficient evidence to support his conviction, primarily because his confession was untrustworthy and involuntary. Because we agree with Reynolds and reverse his conviction and vacate his sentence, we need not address the other issues he raises.

### FACTUAL AND PROCEDURAL HISTORY

The following facts are not in dispute.

Reynolds is an intellectually disabled man in his 40s. He completed ninth grade taking educable mentally handicapped classes and had an individualized education plan throughout his schooling. He repeated both kindergarten and fourth grade. He reads at a fourth-grade level. He has been unable to pass a GED test. He has moderate anxiety and depression. He was often teased and bullied growing up. As a result, he is frightened of others beating him up or yelling at him. To avoid this he often tries to please others even when it is not in his best interests. He has been married twice and had three live-in relationships. Each of these relationships were ended by his partners who complained about him letting people bully him.

Reynolds worked as a cook at a Tex-Mex restaurant. He started there as a dishwasher. He had joint custody with his ex-girlfriend, R.R., of their then three-year-old daughter.

4

In January 2021, R.R. reported that Reynolds had inappropriately touched their three-year-old daughter in December 2020. R.R. reported that her daughter told her "'Daddy touches my no-no and boobs.'" The girl used the term "no no" to refer to her vagina. A medical examination revealed no visible injuries. In an unrecorded forensic interview of the child, her sole statement to the examiner was that Daddy was in jail for touching her "'No-No.'" When asked to point to her "'No-No'" she pointed to her crotch area. When asked if Daddy did touch her there, she was unable to answer. When asked where she was when he touched her there, she was unable to answer. When asked her age, she was unable to answer. The interview ended with no additional engagement from the child.

Police interviewed Reynolds twice. Initially, Deputy Jay Szambecki interviewed Reynolds outside Reynolds' place of work. Reynolds denied ever touching his daughter's vagina. Reynolds believed that R.R. had coached their daughter into making that statement. Reynolds agreed to take a Computer Voice Stress Analysis (CVSA), which the officer explained was a lie detector test that did not require him to be hooked up to a bunch of wires.

Detective Garen Honn interviewed Reynolds at the Coffey County Sheriff's Office. The interview lasted about one hour. Reynolds told the detective he was being "set up." The only time he touched her "down there" was if she had an accident. He never touched her in a sexual manner.

The detective asked Reynolds to take a lie detector test, referring to the CVSA. Reynolds responded that he had nothing to hide. The detective encouraged him to take the test and told him it would help clear his name. This was a reference to the reliability of the test to determine if Reynolds was telling the truth or not. If nothing happened, all would be fine, and they could just move on.

Before the CVSA, Reynolds told the detective he had a speech impediment. Detective Honn said it would not affect the CVSA. Detective Honn read Reynolds his *Miranda* rights. Detective Honn told Reynolds he was not under arrest, and he was free to leave. Reynolds said he understood his rights. Detective Honn admitted that Reynolds did not read the form before signing it. Instead, Reynolds simply stated his best friend's grandfather was an FBI agent. Detective Honn also admitted that he did not elaborate on any of the *Miranda* rights he read to Reynolds and did not know if Reynolds understood words like "appointed." He stated that he made no effort to determine Reynolds' level of education before interviewing him and even if he had known Reynolds fit the definition of "borderline mentally retarded" he would not have adjusted his interrogation techniques.

Detective Honn then explained and administered the CVSA. Prior to administering it, he handed Reynolds a liability waiver form for the test. He did not read it to Reynolds, and Detective Honn admitted Reynolds did not read it before signing it. He told Reynolds that this was to protect the Coffey County Sheriff's Office if he fell out of the chair and got hurt. Reynolds was confused by the comment and responded, "Fall and get hurt?" Detective Honn explained that no one had ever fallen out of the chair. Detective Honn also explained that he was going to ask Reynolds to purposefully lie on a couple questions and told him to which questions he was supposed to lie. Reynolds had difficulty understanding what he was supposed to do and messed it up several times, requiring repeated explanations. When he was told it was about to begin, he repeated out loud the two things about which he was supposed to lie several times, apparently to help him remember them.

During the test, Reynolds denied ever touching his daughter's breasts or vagina for sexual gratification. On several occasions Detective Honn referred to it as a lie detector test or a test able to detect lies.

6

After administering the test, Detective Honn told Reynolds his answer to the question—have you ever touched your daughter's vagina for sexual gratification—showed signs of deception. Reynolds asked what "deception" meant, explaining he had a learning disability. Reynolds repeatedly denied ever touching his daughter "for sexual" gratification. Detective Honn said the test showed "a little bit of a lie." The detective said, "I'm not saying anything extravagant happened but if something happened I need to know." Reynolds still denied touching his daughter.

The detective then suggested, "So did you not do it for sexual gratification. Did you do it just to touch her to know what it feels like or anything else." Reynolds denied touching his daughter "for sexual," but suggested that his hand could have slipped when playing with her. He maintained, "I would never do anything sexual to my daughter." The detective then asked Reynolds to explain what he was thinking during the CVSA questioning, to explain the test result. In other words, come up with a reason this question would have shown deception because this machine is able to unequivocally tell if you are lying. Detective Honn implied the machine could not be wrong.

Reynolds still denied touching her but said—in response to Detective Honn's demand for an explanation—"if my hand slipped or something like that. I was thinking that stuff, would that come up as a lie. Me tickling her. . . . I was worried about what happens if the test is rigged. . . . I was just going by what people were telling me." The detective said, in a clearly frustrated and defensive tone, "I can tell you with my experience, people who do research and try to figure out these machines is because they're guilty." Reynolds said the only time he touched his daughter "down there" was to "help her wash herself when she took baths. Yeah, I touched her. . . . I did it to clean her. But I don't understand why it would come up that I did it for sexual."

The detective pressed, "Did it do anything for you?" Reynolds responded, "It didn't give me an erection or anything like that. . . . But it does make me think about like

7

how . . . sex [offenders] . . . could actually do this to another child. Why would it give them an erection?" Detective Honn continued to press Reynolds in spite of continuous denials. He said, "[Y]ou can't sit here and tell me that you didn't touch it just to see what it feels like." In an escalating and much louder and accusatory voice Detective Honn *suggested* that Reynolds touched her "just to see what it feels like. I'm not saying you stuck your penis in her." He went on. "I need to know did you touch her to see what it felt like . . . [and now yelling] Henry, come on. . . . Talk to me. I'm a man." Reynolds eventually said, "I've done it one time to see what the difference was and stuff like that." He said he did not put his finger "in her." Reynolds described touching her "around the lip part." He explained he "wanted to see what the difference was between a child and a grown woman." He stated that he has a learning disability, and he did not know much about human anatomy and wanted to see.

The detective pressed Reynolds for details. Reynolds responded it had happened about six months earlier on a Sunday at his house on Yuba Street when his daughter was two years old. Six months earlier would have been July 2020, but the detective determines that five months earlier would be September of 2020, and Reynolds agrees it must have been September. At that point there had been no allegations or evidence from R.R. or the child that Reynolds had sexually abused his daughter in July 2020, nor was any such evidence ever brought forward. The detective asked if she was in the bath or if he was changing her. Reynolds responded that it was after his daughter had an accident and he cleaned her. He was getting her dressed and "got curious." Detective Honn *suggested* Reynolds touched her in her "clit area." Reynolds agreed he spread her vagina apart to see if there was a clitoris. He did not see a clitoris and did not believe a child that young has a clitoris. After the detective *asked* (unprompted) if Reynolds had licked or smelled his fingers, Reynolds admitted he smelled his fingers to see if there was a difference between a child and a grown woman. Reynolds insisted it was not done for sexual-gratification, and it did not arouse him. Reynolds stated, "[I]t was wrong. So I tried to forget it. But that's the only thing. I didn't penetrate or anything like that. I was

8

just curious. It was a one time thing." The detective immediately placed Reynolds under arrest for rape. He again declared his innocence.

The State ultimately charged Reynolds with one count of rape of a child under 14 years of age and one count of aggravated indecent liberties with a child, both off-grid person felonies and both for the timeframe "on or between the 1st day of July, 2020 and the 1st day of January, 2021."

To prove the charge of aggravated indecent liberties with a child, the State must establish that Reynolds engaged in lewd fondling or touching of his daughter with the intent to arouse or satisfy his sexual desires. The fondling or touching must be in a manner that tends to undermine the morals of the child and is so clearly offensive as to outrage the moral senses of a reasonable person. K.S.A. 21-5506(b)(3)(B); PIK Crim. 4th 55.121 (2016 Supp.). To establish the charge of rape, the State must establish that Reynolds had sexual intercourse with his daughter. K.S.A. 21-5503(a)(3). Sexual intercourse, as it applies to these facts, means any penetration of the female sex organ, however slight, by a finger. K.S.A. 21-5501(a). Our Supreme Court has noted that a finger entering the vulva or labia is sufficient. *State v. Borthwick*, 255 Kan. 899, 914, 880 P.2d 1261 (1994), relying on *State v. Ragland*, 173 Kan. 265, 268, 246 P.2d 276 (1952).

Before trial, Reynolds moved to suppress his confession. The trial court heard the motion. Detective Honn testified the interview took place in the early afternoon. Reynolds was dropped off at the sheriff's office by his girlfriend. The detective was dressed in plain clothes with a gun and badge. The interview took place in his office with the door closed but not locked. Reynolds was not handcuffed. He had his cell phone with him and took a phone call during the interview.

A clinical psychologist, Mitchell Flesher, testified for the State. He interviewed Reynolds once, on June 30, 2021, administered several testing instruments, and viewed

9

the videotaped interview with Detective Honn. Dr. Flesher was originally asked to evaluate Reynolds only as to his understanding of the *Miranda* warnings and his report only addressed that issue. Dr. Flesher testified Reynolds' estimated IQ score was 62, within the "extremely low range." He testified that the tests he performed on Reynolds indicated that Reynolds has moderate anxiety, severe depression, and both his abstract thinking ability and his verbal comprehension are in the extremely low range.

Dr. Flesher then gave Reynolds two tests that he called "forced choice" tests to determine whether he understood the meaning of the *Miranda* language. This is not a standardized test, but one developed by Dr. Flesher solely for the purpose of evaluating Reynolds' understanding of second-grade vocabulary words and ultimately the *Miranda* warnings. Dr. Flesher did indicate that forced choice tests in general were accepted in the scientific community, but it appears each test is highly individualized. On the other hand, Dr. Flesher admitted that the "Grisso" test has been described in literature as the gold standard for testing understanding of *Miranda* warnings but argued that is because it is the *only* standardized test offered in the field. Dr. Flesher did not use that test.

In the first forced choice test, Reynolds was given a list of second-grade vocabulary words. He was asked to match each word with one of two choices that best represented the meaning of that word. He correctly matched only 9 of the 25 words. Dr. Flesher viewed this as valid because the results fell about the .05 probability of chance performance, with Reynolds being .06. To put another way, even though Reynolds was assessed to read at a fourth- or fifth-grade level, he legitimately struggled with second-grade vocabulary. Dr. Flesher had no doubts about the validity of this test.

In the second test, Dr. Flesher presented Reynolds with the *Miranda* language. Components of each phrase were presented separately, and Reynolds was asked to identify which of two choices correctly expressed the meaning of each component. It is unknown which components were presented or which word choices were provided. The

10

test itself is not in the record. It appears from Dr. Flesher's testimony that Dr. Flesher simply developed it on his own specific to this case. So, in Dr. Flesher's forced choice test related to the *Miranda* warnings, out of 17 components, Reynolds correctly identified only 2. Dr. Flesher concluded that this was *not* a valid result because the results fell below the .05 probability of chance performance, with Reynolds being .001. We do not know from where those probability numbers derived. However, Dr. Flesher concluded in his report,

> "Several of Mr. Reynolds' responses were absurd and implausible. For example, when asked to identify the correct meaning of 'silent' in the phrase 'You have the right to remain silent,' Mr. Reynolds chose 'singing' instead of 'without talking.'"

It was this test along with his viewing of the interview tape that caused Dr. Flesher to conclude that Reynolds was purposely underperforming on the test. He believed that Reynolds knowingly and voluntarily waived his *Miranda* rights. He explained that Reynolds gave the detective nine different possible explanations for the abuse allegation or reasons why it could not be true. Reynolds was "cooperative, talkative, and self-advocating and he unambiguously indicated that he understood the rights described by the detective."

Dr. Flesher was then asked at the suppression hearing to opine if Reynolds was coerced by Detective Honn. Dr. Flesher did not know whether a detective's use of a pseudoscientific technique (referring to the CVSA) would be necessarily coercive for a low intellect individual. He agreed that false confessions were more common for low intellect individuals than for normal intellect individuals. He did not believe the interview with Detective Honn was coercive, despite the use of the CVSA. He based this on the fact that Reynolds did not have difficulty communicating, his vocabulary was sufficient to understand the detective, and he did not just parrot the language of the detective. He did

11

admit that the detective provided possible details to Reynolds to suggest possible motivation.

On the other hand, Dr. Robert Barnett, clinical psychologist, testified for the defense. Dr. Barnett was first asked to evaluate Reynolds' "psychological functioning, including a measurement of his intelligence and reading level." He interviewed Reynolds on or about April 1, 2021, administered several testing instruments, and viewed the videotaped interview with Detective Honn. He concluded that Reynolds read at a fourth-grade level and "should not be seen as capable of any further education or training that requires reading competency." He also testified that Reynolds "really did not comprehend and understand and appreciate his *Miranda* rights." He received similar results on his simple questions regarding Reynolds' understanding of the *Miranda* warnings as Dr. Flesher, although unlike Dr. Flesher, he found no problem with their reliability.

Dr. Barnett presented Reynolds "with a type[d] list of his *Miranda* rights and asked him to read them" out loud. He was able to do so, but Dr. Barnett noted that his understanding of them was notably impaired. For example,

> "1. You have the right to remain silent. Q: What does this mean? A: You mean like Silent Night? Q: What is the purpose of this right? A: Don't know.
> "2. Anything you say can and will be used against you in a court of law. Q: What does this mean to you? A: don't know.
> "3. You have the right to talk to an attorney for advice before we ask you any questions, and to have your attorney present with you while you are being questioned. Q: What does this mean? A: If you feel you were guilty.
> "4. If you cannot afford to hire an attorney, one will be appointed to represent you by the court, before any questioning, if you wish. Q: What does this mean? A: Why do it if you're not guilty?
> "5. If you decide to answer questions now, without an attorney present, you still have the right to exercise these right[s] and not answer any more [questions] or make any

12

more statements. Q: What did you take this to mean? A: I'm lost—didn't know could stop this."

Based on this interaction, Dr. Barnett concluded that Reynolds "had no comprehension of what they meant and what his rights were."

Later Dr. Barnett was asked to evaluate the issue of coercion in the interview. He interviewed Reynolds again, this time on August 3, 2022, administered several testing instruments, and viewed the videotaped interview with Detective Honn. Dr. Barnett testified Reynolds was "mildly intellectually disabled" (formerly designated in the DSM as "mild mental retardation") with an IQ of 67. He testified that people with mild intellectual disabilities "try to be as agreeable as possible." When asked what effect the alleged failure of the CVSA test may have had on Reynolds, Dr. Barnett testified,

"Well, persons who function in his range often are almost obsequious in the face of authority. They will substitute the authority figure's opinion for their own. They tend to believe that if somebody tells them what they're thinking is wrong that they will absorb that and say, well, I guess I was. And I believe that's what happened in this case."

Dr. Barnett testified Detective Honn's interview was coercive. Reynolds was "low functioning intellectually. He tries to please authority figures, he responds in a way that he believes they want him to respond. . . . I don't think he understood why he was there and why he was being questioned." Reynolds did not understand he had incriminated himself.

Barnett noted in his report, which was admitted by stipulation of the parties, that the "[CVSA] is universally viewed by everyone except the manufacturers of the test equipment to be 'pseudoscience.'" He cited studies in support of his statement. Because of this, he believed that Detective Honn was being deceptive. He noted that the National Research Council had concluded that there is "little or no scientific basis for the use of

13

[CVSAs]." The detective "used this 'data' to coerce Mr. Reynolds into 'confessing' to behaviors Mr. Reynolds adamantly denied both before and after the use of the [CVSA]." His report indicated that "even a layperson could tell that Mr. Reynolds is low-functioning" and there was no attempt by law enforcement to assess his level of comprehension, even after Reynolds stated he did not understand simple words like "'deceptive.'"

The trial court denied the motion, adopting the State's proposed findings of fact and conclusions of law. The trial court's order made no mention of Dr. Barnett's report or testimony.

The case proceeded to a bench trial. The parties stipulated to the admission of certain evidence subject to Reynolds' continuing objection to the admission of his confession. Reynolds testified generally that R.R. should not be trusted. In the summer of 2019, R.R. had taken their daughter out-of-state for almost two months without informing him she was leaving. A few months later, R.R. alleged another man had sexually touched their daughter. Reynolds did not believe R.R. because she lied a lot.

Reynolds testified that after Detective Honn told him he failed the lie detector test, his anxiety was really high. He testified,

> "I just wanted to get out of the room so I just told them what they wanted to hear. Because they kept telling me that I was free to leave and stuff like that. But I didn't feel though I was free to leave. So I told them what they just wanted to hear. I lied through the whole thing thinking that I would be okay to go."

That evening after he was arrested, Reynolds was taken to the hospital because his anxiety was giving him "very bad" chest pains. He was given nitroglycerin.

14

The trial court found Reynolds not guilty of rape. The court found that the State failed to prove penetration. But the trial court found him guilty of aggravated indecent liberties with a child—which requires a finding that he fondled his daughter for his own sexual gratification.

He was subsequently sentenced to a 94-month prison sentence. The sentencing court also ordered lifetime postrelease supervision and electronic monitoring.

Reynolds timely appeals.

ANALYSIS

I.  THE TRUSTWORTHINESS OF A CONFESSION V. THE VOLUNTARINESS OF A CONFESSION

A. *Trustworthiness*

Historically, the State was required to show the existence of a crime independently of an extrajudicial confession by the defendant. This has been called the formal corpus delicti rule, translated as "'body of the crime.'" *State v. Dern*, 303 Kan. 384, 399-401, 362 P.3d 566 (2015). Recognizing that false confessions do occur for a variety of reasons, courts use this rule when the only evidence of a crime is the defendant's confession. But Kansas does not follow the formal corpus delicti rule for crimes, such as this one, that produce no tangible injury. The law demands, and only demands, the best proof of the corpus delicti which is attainable given the nature of the crime. 303 Kan. at 408. When the nature and circumstances of the crime are such that it did not produce a tangible injury, the State may show the corpus delicti through a trustworthy confession. 303 Kan. at 410.

When applying the formal corpus delicti rule, the State's burden is met if "'there is some evidence which renders the corpus delicti more probable than it would be without the evidence.'" *State v. Waddell*, 255 Kan. 424, 434, 874 P.2d 651 (1994). But our Supreme Court has noted that the State carries a higher burden than the more probable than not standard when establishing the corpus delicti solely through a trustworthy confession. *Dern*, 303 Kan. at 411.

B. *Voluntariness*

Similarly, the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution require that confessions be voluntary. The Due Process Clause recognizes that "'certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned.' [Citation omitted.]" *State v. G.O.*, 318 Kan. 386, 397, 543 P.3d 1096 (2024). Unlike the aim of the corpus delicti rule to prevent convictions upon false confessions, the aim of due process is to prevent fundamental unfairness in the use of confessions whether true or false. 318 Kan. at 413.

The Due Process Clause protects against involuntary confessions: (1) that are inherently coercive and a per se violation of the Due Process Clause and (2) where a state actor uses interrogation techniques that because of the unique circumstances of the suspect are coercive. 318 Kan. at 397. The former is rare. Under the latter, the Due Process Clause applies "when the interrogation techniques were improper only because, in the particular circumstances of the case, the confession is unlikely to have been the product of a free and rational will." 318 Kan. at 398. Coercive police activity is a necessary predicate to a finding that a confession is involuntary. And there must be a link between the coercive police activity and the resulting confession. 318 Kan. at 398-99.

16

The State bears the burden of proving by a preponderance of the evidence that an individual voluntarily, intelligently, and knowingly waived rights guaranteed by the Fifth Amendment and voluntarily—that is based on the person's unfettered will—made a statement. In that vein, the State must "establish that police or other state actors did not intimidate, coerce, deceive, or engage in other misconduct that, when considered in the totality of the circumstances, was the motivation for the individual to make a statement." 318 Kan. 386, Syl. ¶ 8.

C. *Distinction Between Trustworthiness and Voluntariness*

There is a key distinction between reliability and voluntariness. The reliability of a confession has nothing to do with its voluntariness. Proof that the defendant committed the crime to which he or she has confessed is not to be considered in deciding whether a defendant's will has been overborne and therefore the confession involuntary. *State v. Milow*, 199 Kan. 576, 586, 433 P.2d 538 (1967).

So a confession can be trustworthy, but still involuntary. *G.O.*, 318 Kan. at 388 (reversing Court of Appeals decision finding that because the confession had indicia of reliability, it was voluntary). For example, a confession can be involuntary, although trustworthy, if police failed to advise the defendant of their *Miranda* rights or downplay their importance or otherwise contradict them. 318 Kan. at 415.

Likewise, a confession could be untrustworthy, but still voluntary. As already noted, in a case where there is no tangible injury and the sole evidence is a confession, the State has the burden to prove the testimony (upon which the entire case is based) was trustworthy. If they are unable to establish it is trustworthy, by something more than a preponderance of the evidence, then there is insufficient evidence to support the conviction. This would be true even if the defendant voluntarily and knowingly waived his or her *Miranda* rights prior to confessing.

17

And just like a dog can have ticks and fleas, a confession can be both untrustworthy and involuntary.

D. *Commonality Between Trustworthiness and Voluntariness*

Both trustworthiness and voluntariness must be determined from the totality of the circumstances. This entails consideration of factors relating to the nature of the interrogation and the characteristics of the accused. *G.O.*, 318 Kan. at 400; *Dern*, 303 Kan. at 410-11. As already noted, the State bears the burden of proof regardless of whether the defendant claims their confession was untrustworthy or involuntary. And we use the same standard of review—for the suppression of a confession.

> "In reviewing a trial court's decision regarding the suppression of a confession, an appellate court reviews the factual underpinnings of the decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard. The appellate court does not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence." *State v. Harris*, 293 Kan. 798, 807, 269 P.3d 820 (2012).

II.     THE TRIAL COURT MAKES SEVERAL LEGAL CONCLUSIONS AND PROVIDES THE EVIDENCE UPON WHICH THEY ARE BASED

Here, the facts are not in dispute. The entire interrogation was captured on video. And the State does not submit any evidence of the abuse beyond the unrecorded statement from the child that her daddy was in jail for touching her "no-no." The statement of facts submitted by the State and adopted by the trial court is consistent with the record.

But in its legal conclusions, which we review de novo, the trial court found:

18

1. "*The evidence submitted and the testimony presented do not demonstrate that the age, intellect and background of the defendant support suppression of his statements made to law enforcement.*" (Emphasis added.) The court supports this legal conclusion with a conclusory statement that it is supported by its review of the video of the interview and Dr. Flesher's testimony.

2. "*The defendant did not appear under any undue pressure or influence when speaking to Lt. Detective Honn.*" (Emphasis added.) The court points to Dr. Flesher's testimony to support this legal conclusion. Dr. Flesher noted that Reynolds was able to follow the content of the conversation and respond appropriately and his answers were logical and organized. His "thought content" was coherent and relevant. He did not appear to be having any hallucinations or delusions.

3. *The video confirms Detective Honn's conclusion that Reynolds was not under the influence of any alcohol or drugs that affected his ability to communicate.* The court finds that Dr. Flesher's testimony "supported this conclusion" (referring only to the lack of any evidence that Reynolds was under the influence) by opining that Reynolds was "cooperative, talkative, and self-advocating, and he unambiguously indicated that he understood the [*Miranda*] rights described by the detective." The court concludes from this that Reynolds "*knew he was agreeing to when he signed the Miranda waiver form and agreed to speak to Lt. Detective Honn. The defendant's mental condition did not adversely impact this decision and does not support suppression.*" (Emphasis added.)

4. "*Lt. Detective Honn was fair in his interview with the defendant at all times.*" (Emphasis added.) The court supports this legal conclusion by referring to the videotaped interview and Reynolds' testimony that he touched his daughter's

19

vagina to see the difference between a child and a woman. It is unclear how this supports the conclusion that the interview was "fair."

5. *Reynolds described in detail what he did to his daughter and that he felt bad about it and was trying to forget it.* The court does not describe how this fact supports admission of the confession. The court appears to be indicating that the confession was trustworthy because of the detail provided and thus was voluntary—improperly equating the two concepts.

6. "*There is no indication in the video interview that the CVSA impacted the defendant's ability to self-advocate for himself or to answer questions. There is also no indication that Lt. Detective Honn used the CVSA as subterfuge to trick or otherwise induce the defendant into a false confession.*" (Emphasis added.)

7. "*The defendant has failed to show how he was coerced into provid[ing] an incriminating statement and Dr. Flesher testified that the interview with Lt. Det. Honn was not coercive.*" (Emphasis added.) The court then lists the reasons Dr. Flesher believed the interview was not coercive. Those factors include that the detective did not tell Reynolds what to say; Reynolds was not threatened and Detective Honn's methods were confrontive but not threatening or aggressive; he had access to the outside world; he could communicate adequately; there was no sensory deprivation; he was not isolated; Reynolds was confident, self-advocating and was able to provide details when asked clarifying questions. This finding seems to flip the burden of proof from the State, which must show, by a preponderance of the evidence, that the defendant was not coerced, to requiring the defendant show he was coerced.

8. *Reynolds' intellect was adequate as demonstrated by his statements and as such he made a knowing and voluntary waiver of his* Miranda *rights.*

20

9. "*In the present case, no single factor or combination of factors, argued by the defendant, considered under the totality of the circumstances, leads to the conclusion that the defendant's will was overborne, making the confession not a free and voluntary act. . . . [T]he record demonstrates that the defendant possessed the ability to understand . . . the purpose of the interview. In turn, there is nothing in the record presented to this court for the court to conclude that Lt. Det. Honn 'create[d] a coercive environment.'. . . As such, the totality of the circumstances definitively shows the defendant's statement to Lt. Detective Honn was a free and voluntary act and the statements made to Lt. Det. Honn were not the result of police coercion. This finding and conclusion is also supported by the testimony and expert opinion of Dr. Flesher.* [Citations omitted.]" (Emphasis added.)

10. "*Given the totality of the circumstances, neither the defendant's intelligence nor his general mental condition interfered with his ability to understand his* Miranda *rights or to voluntarily and knowingly waive those rights, to understand Lt. Detective Honn's questions, or to provide responses to those questions. In addition, there is no evidence in the record that supports coercive police activity on behalf of Lt. Det Honn in coercing the defendant into confessing.*" (Emphasis added.)

The court denied Reynolds' motion to suppress.

III. REYNOLDS' CONFESSION WAS NEITHER TRUSTWORTHY NOR VOLUNTARY

A. *We first examine the factors that are unique to a trustworthiness analysis.*

Independent of Reynolds' statement, the evidence here is insufficient, as a matter of law, to establish that the charged crime—aggravated indecent liberties of a child—is more likely than not to have occurred. The child's reported disclosure did not suggest that

21

Reynolds had touched her in a noncaregiving manner. And there were no reports of sexual abuse by Reynolds six months earlier. Yet it was his statement that he touched his daughter's genital area out of curiosity, that formed the basis of the charges. Thus the State has the burden to establish that the confession was trustworthy. And as already noted, the State carries a higher burden when establishing the commission of a crime solely through a trustworthy confession. *Dern*, 303 Kan. at 411.

A determination of trustworthiness of the confession depends on the totality of the circumstances and includes consideration of the following nonexclusive factors or indicia of reliability:

> "(1) independent corroboration of details or specific facts contained in the confession; (2) the number of times the confession was made and the consistency or lack thereof between different versions of the confession; (3) the circumstances of the confession, including the identity of the person or persons to whom the confession was made and the state of mind of the defendant at the time of the confession; (4) the availability of the facts or details contained in the confession from sources outside the defendant's personal knowledge; (5) the defendant's age, education, experience, and mental health; and, (6) if the confession was made to law enforcement, then the overall fairness of the exchange including whether there was deception, trickery, undue pressure, or excessive length." 303 Kan. at 410-11.

### (1) *Independent corroboration of details or specific facts contained in the confession*

The State presented no evidence that independently corroborated Reynolds' confession. The child's mother reported her daughter told her, "'Daddy touches my no-no and boobs.'" The child used the term "no no" to refer to her vagina. During a forensic interview, the child said her daddy was in jail for touching her "no, no." She placed her hand over her private area. No other evidence was provided. Moreover, there was no independent corroboration of an unlawful touching six months earlier.

22

As noted above, under these facts, we find that a hearsay statement that a father has touched his child's private area and boobs with no confirmation by the child and no other evidence pointing to a touching for sexual gratification rather than normal caregiving is insufficient independent corroboration to establish the trustworthiness of a confession.

(2) *Number of times the confession was made*

Reynolds confessed only once to touching his daughter's vaginal area when it was not necessary to clean her. He did so after repeated denials and never admitted it was for sexual gratification. He indicated it happened six months earlier, when there had been no allegation at all of sexual abuse.

(3) *Circumstances of the confession, including the identity of the person to whom the confession was made and the state of mind of the defendant*

Reynolds confessed during an interrogation by a detective at the sheriff's office. Reynolds was cooperative and talkative throughout the interview. But he was also nervous, angry, and afraid. In fact, he was hospitalized for the anxiety immediately after the interrogation.

(4) *The availability of the facts or details contained in the confession from sources outside the defendant's personal knowledge*

There were no additional facts or details available from outside sources.

(5) *The defendant's age, education, experience, and mental health*

Reynolds is an intellectually disabled man in his 40s. He completed ninth grade taking mentally handicapped classes. He reads at a fourth-grade level—although this was

thrown into question by Dr. Flesher's testing that revealed he could not identify 16 of the 25 second-grade vocabulary words presented to him. He has an IQ score in the 60s, or the "extremely low range." Both experts agreed that Reynolds suffers from anxiety and depression.

Although the State and the trial court relied exclusively on Dr. Flesher's testimony, the State did not dispute the evidence submitted by Dr. Barnett. According to Dr. Barnett, Reynolds was often teased and bullied growing up. As a result he is frightened of others beating him up or yelling at him. To avoid this he often tries to please others even when it is not in his best interests. He has been married twice and had three live-in relationships. Each of these relationships were ended by his partners who complained about him letting people bully him. Dr. Barnett testified that people with mild intellectual disabilities "try to be as agreeable as possible." Dr. Flesher agreed that false confessions were more common for low intellect individuals than for normal intellect individuals.

(6) *The overall fairness of the interrogation including whether there was deception, trickery, undue pressure, or excessive length*

The interrogation was not excessively long—it lasted only an hour, Detective Honn made no promises or threats, Reynolds was free to leave, and Reynolds had his cell phone throughout.

However, our review of the videotape of the confession makes it clear to us that Detective Honn manipulated Reynolds by claiming the CVSA showed he was lying, conveying absolute certainty of his guilt, minimizing the weight of the offense of lewd touching by framing it as a denial of sexual penetration, asking leading questions, and raising his voice.

24

The CVSA was recently discussed by our Supreme Court in *State v. Garrett*, 319 Kan. 465, 555 P.3d 1116 (2024). There the officers had claimed the CVSA was 100% accurate, but a witness testified it was only 15-50% accurate in detecting truthfulness or "'[n]o better than flipping a coin.'" 319 Kan. at 467-68. The officers' claim that the CVSA was 100% reliable was deceptive. But the court went on to conclude that Garrett "was a grown man of apparently average intelligence." 319 Kan. at 477. Although Garret argued he was stressed and tired, the majority concluded that there was no evidence that this condition "'made [Garrett] seem confused, unable to understand, unable to remember what had occurred, or otherwise unable to knowingly and voluntarily waive the right to remain silent.'" 319 Kan. at 477-78. As the Supreme Court noted in Garrett, "[s]ometimes deceptive practices by law enforcement constitute misconduct, but not always. The difference is a matter of degree, gauged by what the officers knew or could have ascertained about the defendant." 319 Kan. at 479-80.

Here, Detective Honn was not faced with a man of average intelligence. Instead everyone agrees that Reynolds has an extremely low IQ and minimal reading ability. Reynolds displayed confusion, not knowing the meaning of the word deception. He did not understand when Honn told him he had to sign the waiver so he would not sue the sheriff if he fell out of his chair. He could not follow the basic instructions of the test related to when he was supposed to purposefully lie.

In addition, no reasonable person could view the videotape of the confession and fail to see the intimidation by Detective Honn. He suggested explanations for a "failed" test to include just checking to see if his daughter's genitalia was different from that of a woman, suggesting to Reynolds that he smelled his finger after examining her, and suggesting that all of this would explain the test result. He certainly left anyone listening with the impression that such an explanation would be understandable. Although Reynolds insisted he did not penetrate his daughter, he was certainly not aware of the legal nuances of penetration that could result in a charge of rape. And even though

25

Reynolds appeared to be trying to please Detective Honn, Reynolds continued to deny examining his child's genitalia for sexual gratification.

And the State presented no evidence regarding the reliability of the CVSA in support of Detective Honn's claims to Reynolds. Dr. Flesher opined that the use of the test was not relevant in his analysis. He knew nothing about the test. Accordingly, Dr. Barnett was unchallenged in the statement in his report that CVSA is universally viewed by everyone except the manufacturers of the test equipment to be "'pseudoscience.'" He quoted a study from the National Research Council that found that there is little or no scientific evidence to support the reliability of CVSA. So continuing to insist that the CVSA was unassailable and Reynolds was lying was deceptive and coercive.

### (7) *Totality of the circumstances*

Reynolds' low intellect, history of being bullied, and anxiety made him unusually susceptible to being coerced by a detective telling him he failed a lie detector test. The question is whether the detective's technique and reliance on the CVSA result made Reynolds believe he had committed a crime that he had not committed. We believe it did.

When confronted with the fact that the test showed he was lying, Reynolds suggested that the test was rigged, at least that is what friends had told him. Detective Honn was forceful in advising Reynolds that if you challenge the reliability of the CVSA you must be guilty. So Reynolds, while still denying he touched his daughter in any way other than as part of normal caregiving, was forced to come up with an explanation to satisfy Detective Honn. It was apparent the interview was not going to end until Detective Honn was satisfied.

Detective Honn then led Reynolds down a path of suggested reasons it could be showing deception, such as an innocent explanation for the touching—curiosity. He then

26

insisted on more details and again suggested Reynolds smelled his fingers after he touched his daughter, obviously trying to establish a sexual motivation. These were all scenarios invented and initiated by Detective Honn, not Reynolds. The totality of the circumstances shows unequivocally that Reynolds' confession was not trustworthy.

In sum, we reject the trial court's legal conclusion that the evidence did not support a finding that Reynolds' confession was the product of coercion. And even given Reynolds' limited mental capacity, the trial court accepted the truthfulness of his confession by entering a finding of guilty to the charge. To the contrary, we find that, on the undisputed facts, the State failed to meet its high burden of establishing that Reynolds' conviction—based solely on a confession with no tangible injuries—was nonetheless trustworthy.

B. *We examine the factors that are unique to a voluntariness analysis.*

Voluntariness must be determined from the totality of the circumstances. *G.O.*, 318 Kan. at 400. This entails consideration of factors relating to the nature of the interrogation and the characteristics of the accused. Relevant details of the interrogation may include:

> "[T]he length of the interview; the accused's ability to communicate with the outside world; any delay in arraignment; the length of custody; the general conditions under which the statement took place; any physical or psychological pressure brought to bear on the accused; the officer's fairness in conducting the interview, including any promises of benefit, inducements, threats, methods, or strategies used to coerce or compel a response; whether an officer informed the accused of the right to counsel and right against self-incrimination through the *Miranda* advisory; and whether the officer negated or otherwise failed to honor the accused's Fifth Amendment rights." 318 Kan. at 403.

27

Relevant characteristics of the accused may include: "the accused's age; maturity; intellect; education; fluency in English; physical, mental, and emotional condition; and experience, including experience with law enforcement." *G.O.*, 318 Kan. at 403. There is some overlap in factors courts are required to examine related to trustworthiness and voluntariness.

(1) *Waiver of* Miranda *rights*

Reynolds argues that even though he waived his *Miranda* rights, Detective Honn intentionally downplayed the significance of the *Miranda* warning. We agree.

After reading the *Miranda* rights, the detective asked, "You understand those?" Reynolds did not say anything. The detective said, "You're not under arrest. This is part of my paperwork . . . You're free to walk out of this office right now. But I wanted to make sure you understand your rights." Reynolds then quickly responded, "Oh, I understand. I had a best friend in Colorado, his grandfather was an FBI agent and his grandmother is a . . . sheriff's officer."

An officer's attempt at minimizing a defendant's constitutional rights can, in certain circumstances, contribute to a coercive atmosphere and lead to an involuntary statement. *Garrett*, 319 Kan. at 479; *G.O.*, 318 Kan. at 415.

In *Garrett*, a detective preceded the *Miranda* advisory by saying he needed to "'jump through some hoops.'" 319 Kan. at 466. This is very similar to Detective Honn's statement that he just needed to do this as part of his paperwork. Like Reynolds, Garrett denied the allegations against him. The officers then asked Garrett to take a CVSA. Before administering the test, an officer read Garrett his *Miranda* rights from a release form and Garrett initialed beside each one. There is no evidence here that Reynolds initialed each *Miranda* paragraph, only that he signed it without reading it. On appeal, the

28

court concluded: "While the reasons and importance of the first *Miranda* advisory were minimized, the second advisory repeated the ones already given and Garrett acknowledged each one. . . . This clearer and more forceful recitation of Garrett's rights alleviated any coercive effect that the initial reading caused." 319 Kan. at 479.

But in *G.O.*, a confession was deemed involuntary because the detective downplayed the *Miranda* warnings, encouraged G.O. to confess to avoid prosecution, misrepresented the true purpose of the interview, telling G.O. he would not be arrested, and G.O.'s emotional state, age, and lack of experience with law enforcement made him vulnerable to coercion. 318 Kan. at 414, 421.

Here, the detective downplayed the *Miranda* warning by saying it was part of his "paperwork." He stressed that Reynolds was not under arrest but followed that with a statement that as long as he told the truth they could "move on," suggesting that he could only leave or move on if he told the truth as defined by the results of the CVSA.

(2) *Fairness in conducting interrogation*

Reynolds contends the interrogation was unfair because Detective Honn repeatedly told him his protestations of innocence were definitively disproven by a lie detector test that was, in fact, incapable of detecting lies.

The district court concluded that the CVSA did not impact Reynolds' ability to self-advocate for himself or to answer questions. The court concluded Detective Honn did not use the CVSA as subterfuge to trick or otherwise induce Reynolds into a false confession. We disagree.

Voice stress analysis and polygraph testing have been used by law enforcement for years and do not necessarily render a subsequent confession involuntary. But our

29

Supreme Court has found that an officer's exaggeration of the reliability of CVSA to identify the "truth" is deceptive. *Garrett*, 319 Kan. at 473. Although deceptive practices by law enforcement do not always constitute misconduct, if law enforcement uses the CVSA as subterfuge to trick or otherwise induce a defendant into a false confession, it can result in the confession being deemed involuntary.

"Sometimes deceptive practices by law enforcement constitute misconduct, but not always. The difference is a matter of degree, gauged by what the officers knew or could have ascertained about the defendant; a lie told to a child, after all, will have a far greater impact than a falsehood given to an adult. Here, nothing about Garrett himself or the other surrounding circumstances of the interrogation could have exacerbated the effect of the deception. While our threshold assessment of misconduct differs from the ultimate question of voluntariness, we note that many cases have found a voluntary confession even when presented with law enforcement's deceptive tactics." 319 Kan. 479-80.

In *Garrett*, officers repeatedly represented to Garrett that the CVSA is 100% accurate. However, at the motion to suppress hearing an expert testified the CVSA is only 15-50% accurate in detecting truthfulness or "'[n]o better than flipping a coin.'" 319 Kan. at 468. The CVSA "cannot discriminate general stress from 'case-specific' stress." 319 Kan. at 468. In holding the officers' deception was not misconduct, the court stated the deception was not pervasive because the officers did not rely heavily or repeatedly on the results. The officers did not say the exam proved Garrett lied or proved his guilt. The officers asked Garrett about the results just once or twice. 319 Kan. at 480-81.

Here, although Detective Honn never verbalized that the CVSA was 100% reliable, in response to Reynolds' concern that the test could be rigged, the detective said "[t]he test is not rigged" and indicated that Reynolds' concern about the test showed he was guilty. The detective also assured Reynolds that him being angry or stressed about being accused would have no effect on the test. Those statements were undisputably

30

deceptive because the CVSA is not a reliable measure of truthfulness and cannot distinguish general stress from specific stress.

Detective Honn did rely heavily on the CVSA result. Detective Honn told Reynolds his answer to the question—have you ever touched your daughter's vagina for sexual gratification—showed "signs of deception." Reynolds asked what "deception" meant, explaining he had a learning disability. The detective said, "Deception means that you weren't being honest with me. There's a little bit there. There's a little bit of a lie there, not the truth is what it's telling me." Detective Honn then relied repeatedly on the results of the CVSA, suggesting the test showed Reynolds was lying over his continuous denials. Detective Honn relied upon Reynolds to come up with an explanation for the CVSA result.

(3) *Psychological pressure*

Reynolds contends that Detective Honn downplayed conduct that carried a life sentence as nothing "extravagant," elicited admissions to lewd touching by framing the admissions as denials to sexual penetration, and used leading questions to flesh out the details of Reynolds' confession. We agree.

A confession may not be the product of the defendant's free and independent will when the detective uses an interrogation technique where the defendant does not volunteer facts but rather merely adopts facts suggested by the detective. *State v. Stone*, 291 Kan. 13, 29-33, 237 P.3d 1229 (2010) (confession mirrored the details suggested by law enforcement officers).

Here, Detective Honn asserted psychological pressure. "I'm not saying anything extravagant happened but if something happened I need to know." The detective then suggested that Reynolds touched his daughter to "know what it feels like." Reynolds did

31

not adopt that suggested fact. Rather, Reynolds said he touched his daughter to clean her. Reynolds denied that he got aroused, but said it made him think about why sex offenders could be aroused by a child. Reynolds did not understand why they would be.

After Reynolds repeatedly denied touching his daughter for sexual gratification, the detective again suggested Reynolds touched her "just to see what it feels like" and minimized that touching a couple of times by saying, "I'm not saying you stuck your penis in her." Eventually, Reynolds relented and said, "I've done it one time to see what the difference was [between a child and a grown woman]." After Reynolds made his first admission, the detective did not immediately ask leading questions, but instead said, "Describe to me how you touched her." Reynolds drew with his finger how he touched her. Then the detective asked leading questions to get the details of the incident.

Dr. Barnett concluded that Detective Honn "employed pseudoscientific procedures to convince a mentally retarded adult that he is being deceptive." Particularly when Reynolds made clear he did not know what the word "deceptive" meant. "Mr. Reynolds, in my opinion 'confessed' to illegal behavior only because Detective Honn convinced him that the [CVSA] indicated he was lying, and that if he told the 'truth' he would be allowed to go home." We find Dr. Barnett's analysis and conclusion convincing and supported by the videotape of the interview.

(4) *Education and intellect*

Reynolds argues his poor education and low intellect made him unusually susceptible to the psychological pressure of interrogation.

The district court concluded Reynolds' statements and responses to Detective Honn demonstrated Reynolds' intellect was adequate. Reynolds' intelligence and mental condition did not interfere with his ability to understand his rights, voluntarily waive his

32

rights, and respond to questions. We do not believe this conclusion was supported by any competent evidence.

Although Reynolds was talkative, coherent, self-advocating, and ultimately remorseful, he was also frustrated, nervous, and stressed during the interview.

Reynolds is an intellectually disabled man with an IQ score in the 60s, or the "extremely low range." He completed ninth grade taking mentally handicapped classes. He reads at a fourth- or fifth-grade level. During the CVSA test, Reynolds got confused on which questions he was supposed to tell the truth and lie to. He did not know the meaning of the word "deception" and told the detective he had a learning disability.

Although low intelligence alone does not make a confession involuntary, a defendant's low intelligence and mental condition are relevant to an individual's susceptibility to police coercion but do not render a confession involuntary in the absence of police coercion. *State v. Randolph*, 297 Kan. 320, 330, 301 P.3d 300 (2013) (collecting cases); see *G.O.*, 318 Kan. at 420 (defendant's anxiety increased his vulnerability to coercion); *State v. Barrett*, 309 Kan. 1029, 1044-45, 442 P.3d 492 (2019); *State v. Swanigan*, 279 Kan. 18, 39, 106 P.3d 39 (2005) (low IQ and anxiety of defendant considered in totality of circumstances).

In *Randolph*, though a low intellect defendant had trouble reading the word "'coercion,'" his confession was voluntary because he understood the word once its meaning was explained, there was no indication during the interview that his intelligence interfered with his ability to understand his rights, waive those rights, understand the officer's questions, or understand the incriminating nature of his statements. 297 Kan. at 330-31.

Here, Reynolds' low IQ did prevent him from understanding his rights or responding to questions as well as making him susceptible to police coercion.

Dr. Barnett went over the *Miranda* rights with Reynolds and his understanding of them on two different occasions. The transcript of this questioning was included in Dr. Barnett's report. It was clear to Dr. Barnett that Reynolds had cognitive problems preventing his full understanding of his rights. It was clear to Dr. Barnett that "even though he gave the impression of reading them originally, he had no meaningful or sophisticated comprehension of what they meant and what his rights were." When this is coupled with Reynolds' "history of subservient compliance with instructions by authority figures, it seems that the entire purpose of the *Miranda* warning in this case was bypassed."

Dr. Barnett stressed the primary indicators of understanding *Miranda* warnings, in his opinion, are IQ and reading ability. He stressed that in his 40 years of experience, the vast majority of people that score in Reynolds' IQ range are unable to competently understand the *Miranda* warnings. He estimated that reading at a sixth- or seventh-grade level would be conducive to understanding the warnings. But coupled with his low IQ, Reynolds could only read at most at a fourth-grade level. He may have said he was waiving his rights, but did he have any concept of what he was waiving. Dr. Flesher agreed with Dr. Barnett's assessment of Reynolds' IQ and reading level and agreed that these were important indicators, but he believed observation of the police interview is also important and it contradicted these indicators.

Even the ad hoc forced choice test administered by Dr. Flesher regarding Reynolds' understanding of his *Miranda* rights showed he could only correctly identify 2 of the 17 components of the *Miranda* warning, again showing significant cognitive impairment. But Dr. Flesher discounted those results as unreliable. We do not know what those 17 components were or the forced choices given to Reynolds because they were not

34

included in his report. Dr. Flesher also testified that after reviewing Dr. Barnett's report and questions related to *Miranda* warnings, he thought Reynolds was "suppressing his actual ability level" making Dr. Barnett's conclusions incorrect regarding Reynolds' understanding of the *Miranda* warnings.

Discounting the one test that he devised himself, and also his discounting of Dr. Barnett's test and its conclusions, Dr. Flesher seems to rely exclusively on his viewing of the videotape which disclosed that Reynolds was "cooperative, talkative, and self-advocating, and he unambiguously indicated that he understood his rights described by the detective." In other words, because Reynolds "unambiguously" indicated he understood his rights, he must have understood them. He does not address how a person, who he found to be functioning at an extremely low intellectual level and who agrees was legitimately having trouble recognizing second-grade vocabulary words, could nevertheless understand complex and nuanced legal rights.

Dr. Barnett emphasized that people that are as low functioning as Reynolds may sometimes appear to be normal functioning. They develop strategies to be as agreeable as possible and not "make waves." They will pretend to understand things when they really don't know what's going on.

> "[They] are almost obsequious in the face of authority [and] will substitute the authority figure's opinion for their own. They tend to believe that if somebody tells them what they're thinking is wrong that they will absorb that and say, well, I guess I was. And I believe that's what happened in this case."

We agree and reject the trial court's legal conclusion to the contrary. The trial court never discusses why it so fully rejected all of Dr. Barnett's testimony and report, even though other than his final conclusion, it was undisputed.

35

(5) *Totality of the circumstances*

In sum, the district court drew a legal conclusion from the undisputed evidence that Reynolds' statements were free and voluntary and not the result of police coercion.

Here, the interrogation was only about an hour, Reynolds had access to the outside world, Reynolds understood the purpose of the interview, and the detective offered no direct threats or inducements. But the detective downplayed the *Miranda* warning by saying it was part of his "paperwork," an attempt to minimize its importance. The detective used many leading questions. The detective relied repeatedly on the CVSA result over Reynolds' repeated denials. Before even starting the test, Detective Honn told Reynolds that if he passed the test, they could just move on. In other words, everything would be fine. The logical conclusion from such a statement is that if he does not pass the test, one that is universally accepted as unreliable, everything would not be fine. After the test the detective said the CVSA result showed that Reynolds had lied. The pressure was increased by the detective. He quickly corrected Reynolds when he suggested the test might be rigged, saying that only people who are guilty question the test. He raised his voice and said they were talking man to man, Reynolds should just tell the truth. Again, Detective Honn is drawing the conclusion that Reynolds must be lying because the CVSA suggested he was. In addition, Detective Honn stated unequivocally that had he known of Reynolds' intellectual and psychological challenges including his undisputed diagnosis of "borderline mentally retarded"—which he made no effort to determine before interviewing him —he would not have adjusted his interrogation techniques.

Our legal conclusion, contrary to that of the trial court, is that Detective Honn convinced an intellectually challenged man that he must be lying. Reynolds was stressed, nervous, and scared. He was intellectually susceptible to coercion and intellectually incapable of fully understanding the *Miranda* warnings given. His whole life he had been the victim of bullying and, as a result he is frightened of others beating him up or yelling

36

at him. To avoid this he often tries to please others even when it is not in his best interests. That is what he did here when faced with Detective Honn's coercive questioning.

IV.    EVEN IF THE "CONFESSION" WAS VOLUNTARY AND TRUSTWORTHY, THERE WAS INSUFFICIENT EVIDENCE TO CONVICT REYNOLDS OF AGGRAVATED INDECENT LIBERTIES

Finally, Reynolds argues that there was insufficient evidence to convict him of aggravated indecent liberties. We agree and find that even if the "confession" was voluntary and trustworthy, there was still insufficient evidence to convict Reynolds of aggravated indecent liberties.

The total undisputed evidence is that R.R. reported to police that her daughter told her that the child's father, Reynolds, had touched her no-no and boobs just a few days earlier. The child did not confirm this in any interviews and only stated that her father was in jail for touching her "no-no." Reynolds did not confess to anything related to an unlawful touching of the child in December 2022. There is no evidence that any touching took place at that time, let alone touching unrelated to caregiving. R.R. did not testify at the trial or the suppression hearing.

Accordingly, the aggravated indecent liberties charge was based solely on Reynolds' confession that six months earlier he had looked at the child's genital area by parting her labia to see if she had a clitoris. He concluded she did not. His testimony was that this was not done for sexual gratification, but just out of curiosity. The State presented no evidence to rebut this claim, to corroborate the incident, or to establish that whatever Reynolds did was done for sexual gratification.

We have no trouble finding as a matter of law that the evidence was insufficient to support Reynolds' conviction for aggravated indecent liberties.

37

Reynolds has now been in jail or prison for over three years—since his arrest by Detective Honn on January 4, 2021—based on insufficient evidence and an involuntary and untrustworthy confession. Today we reverse Reynolds' conviction, vacate his sentence, and order him released from prison on this charge upon issuance of the mandate.

Conviction reversed and sentence vacated.